# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

ACELA INVESTMENTS LLC, ACELA
FIRST INVESTMENTS LLC, ACELA NEW
INVESTMENTS LLC, and DR. STEFAN
AIGNER,

    Plaintiffs,

    v.

RAYMOND DIFALCO and MANISH
SHAH,

    Defendants,

  and

INSPIRION DELIVERY SCIENCES, LLC
and INSPIRION DELIVERY
TECHNOLOGIES, LLC,

    Nominal Defendants.

RAYMOND DIFALCO,

    Counterclaim and Third-Party
    Plaintiff,

    v.

DR. STEFAN AIGNER,

    Counterclaim Defendant,

  and

INSPIRION DELIVERY SCIENCES, LLC,

    Third-Party Defendant.

C.A. No. 2018-0558-AGB

# MEMORANDUM OPINION

Date Submitted: March 15, 2019
Date Decided:  May 17, 2019

Peter B. Ladig and Brett M. McCartney of BAYARD, P.A., Wilmington, Delaware; David H. Wollmuth and Michael C. Ledley of WOLLMUTH MAHER & DEUTSCH LLP, New York, New York.  *Attorneys for Plaintiffs and Counterclaim Defendant.*

Norman M. Monhait and Carmella P. Keener of ROSENTHAL, MONHAIT & GODDESS, P.A., Wilmington, Delaware; William T. Reid, IV, Michael Yoder, Jordan L. Vimont, and Ryan M. Goldstein of REID COLLINS & TSAI LLP, Austin, Texas.  *Attorneys for Defendants and Counterclaim and Third-Party Plaintiff.*

**BOUCHARD, C.**

About thirteen years ago, Raymond DiFalco and Manish Shah began working together on a promising technology to deter the abuse of opioids and other drugs. In 2008, they joined with Stefan Aigner, a pharmaceutical executive, to form the predecessor of a Delaware limited liability company known as Inspirion Delivery Sciences, Inc. ("IDS"), which was established in 2016. Today, IDS owns two FDA-approved drugs but has achieved limited commercial success.

The LLC agreement for IDS contains a bespoke governance structure. It names Aigner and DiFalco as Chief Executive Officer and President, respectively, and provides that they each must perform their duties subject to the "advice and consent" of the other. The LLC agreement further provides that either (i) Aigner or (ii) DiFalco and Shah together can veto any action of the IDS board of managers. The LLC agreement also contains a provision that was intended to address conflicts of interest by having an "Independent Representative" vote in place of a conflicted manager, but which has become a central point of controversy in its application.

Although Aigner, DiFalco, and Shah began their venture with a promising technology and presumably the best of intentions, their relationship has devolved into one of distrust and animosity between Aigner, on the one hand, and DiFalco and Shah, on the other hand. The two camps have become deadlocked on fundamental questions concerning who IDS should partner with to manufacture its two current products and to develop new products, and concerning the strategic direction of the

1

company, in particular whether its limited resources should be used for research and development or to build an in-house sales force. After a lengthy period of infighting and numerous unsuccessful efforts to resolve their disputes, Shah resigned from his positions as Chief Science Officer and a manager of IDS. Shortly after, Aigner initiated litigation against DiFalco and Shah, prompting DiFalco to request judicial dissolution of IDS.

In this post-trial decision, the court concludes for the reasons explained in detail below that it is not reasonably practicable to carry on the business of IDS in conformity with its LLC agreement and that judicial dissolution of the company is warranted. In brief, the record shows that Aigner has arrogated to himself virtually unfettered control over the company's management in contravention of the company's contractually specified governance structure by acting unilaterally instead of trying to work collaboratively with DiFalco and by using the conflict of interest provision in the LLC agreement improperly as a weapon to marginalize DiFalco's role in managing the company.

## I. BACKGROUND

The facts recited in this opinion are my findings based on the testimony and documentary evidence presented during a three-day trial held in December 2018. The record includes stipulations of fact from the Pre-Trial Stipulation and Order ("PTO"), over 350 trial exhibits, and testimony from eight fact witnesses.

2

## A. The Players

The company at the center of the dispute in this case is Inspirion Delivery Sciences, LLC ("IDS" or the "Company"), a Delaware limited liability company that develops abuse-deterrent pharmaceutical products.[1] IDS is the successor to Inspirion Delivery Technologies, LLC ("IDT"), a Delaware limited liability company that now serves as a holding company for IDS and owns approximately 72% of its membership interests.[2] IDT was co-founded by Stefan Aigner, Raymond DiFalco, and Manish Shah, the main protagonists in this action.

Aigner is the Chief Executive Officer and a manager of both IDT and IDS.[3] Aigner has executive experience in the specialty pharmaceutical industry and is the owner and/or managing partner of three entities through which he owns membership interests in IDT and IDS: Acela Investments LLC, Acela First Investments LLC, and Acela New Investments LLC, all Delaware limited liability companies.[4] For simplicity, this decision refers to Aigner and these three entities together as "Aigner" when discussing the plaintiffs collectively.

---

[1] PTO ¶¶ 21, 24, 36; Tr. 7 (Aigner).

[2] PTO ¶¶ 23, 36.

[3] PTO ¶ 20.

[4] PTO ¶¶ 17-20; Tr. 9-10 (Aigner).

3

DiFalco is a member, manager, and President of IDT, and a manager and President of IDS.[5] Aigner attempted to remove DiFalco as President of IDS in November 2018 but, as discussed below, that action was invalid. DiFalco is trained in chemical engineering and has expertise in the development and construction of pharmaceutical manufacturing processes.[6]

Shah is a member of IDT.[7] Shah is a scientist with more than twenty years of experience in the pharmaceutical industry, primarily in developing pharmaceutical products.[8] Shah was formerly a manager of both IDT and IDS and the Chief Science Officer of IDS.[9] He resigned as a manager of IDT and IDS on July 6, 2018, and as an officer of both companies on October 15, 2018.[10]

DiFalco and Shah have been aligned with each other at all relevant times. They are the co-inventors of the abuse-deterrent technology that was the reason for creating IDT and that is central to IDS's business prospects.[11] DiFalco and Shah co-own Cerovene, Inc., a Delaware corporation, which served as IDT's development

---

[5] PTO ¶ 21.

[6] Tr. 662, 664 (DiFalco).

[7] PTO ¶ 22.

[8] Tr. 547-48 (Shah).

[9] PTO ¶ 22.

[10] PTO ¶ 22; JX 277.

[11] PTO ¶ 22.

4

partner for two drugs (MorphaBond and RoxyBond) and is a party to a supply agreement with IDS for one of those drugs (MorphaBond).[12]

Before Shah resigned as a manager of IDS in July 2018, the Company's board of managers (the "Board") consisted of four members: Aigner, DiFalco, Shah, and Gerard Leduc. Leduc is a French citizen who invested in IDT in 2015 and became a manager of IDS and IDT in September 2016.[13]

Most of the funds that were invested in IDT to pay for the development of MorphaBond and RoxyBond came from the predecessor of an entity known as Trygg IDT I Holdings Corporation ("Trygg"), a Delaware corporation.[14] Trygg is a joint venture between private equity firm Lindsay Goldberg LLC and Aker AS, a Norwegian industrial investment company.[15] Aigner introduced IDT to Trygg through Egil Bodd, a Norwegian doctor and clinical pharmacology specialist who was working at Lindsay Goldberg at the time. Bodd invested in IDT personally and facilitated Trygg's investment in IDT as well as an investment from his friend, Per Wold-Olsen, a Norwegian citizen who previously worked with Bodd at Merck Pharmaceuticals.[16] Aaron Kramer is the CEO of Trygg and serves as a Board

---

[12] PTO ¶ 30.

[13] PTO ¶ 25.

[14] PTO ¶ 27.

[15] PTO ¶ 27.

[16] Tr. 145, 150-54 (Bodd); PTO ¶¶ 28-29.

observer under the IDS LLC agreement.[17]   John Aiello, a partner at Lindsay Goldberg, also is a Board observer.[18]

## B.   Basic Process for Production of New Drugs

The production of new drugs in the United States typically proceeds in the following stages:  formulation, clinical development, commercial manufacturing, and commercialization.[19]  Formulation involves developing specific formulas for a new drug, which can be done in-house or by an outside firm.[20]  Clinical development includes performing studies to show that the new drug is effective, filing a new drug application ("NDA") with the Food and Drug Administration (the "FDA"), and receiving FDA approval.[21]  The cost of obtaining FDA approval for a single drug of the kind IDS develops is approximately $10 to $15 million.[22]

Commercial manufacturing entails large-scale manufacturing of the drug, which may include a transfer of technology or "tech transfer" to a high-capacity manufacturing facility under the guidance of the drug developers.[23]  Third-party firms that perform the commercial manufacturing are called contract manufacturing

---

[17] PTO ¶ 27.

[18] PTO ¶ 27.

[19] Tr. 16-18 (Aigner); Tr. 624 (Shah).

[20] Tr. 16 (Aigner).

[21] Tr. 16-17 (Aigner).

[22] Tr. 156 (Bodd); Tr. 550-51 (Shah); Tr. 700 (DiFalco).

[23] Tr. 17 (Aigner).

organizations or "CMOs."[24] Finally, commercialization focuses on the marketing and sale of the new drug by a sales force, which can range in size from about thirty to 500 people.[25] A pharmaceutical company may employ its own sales force or license its products to an outside firm with a sales force.[26]

## C. The Formation of IDT

It is well documented that the United States is facing an opioid crisis. A contributing factor to the abuse of opioids and other drugs is that the time-release characteristic of tablets of such drugs can be compromised by crushing the tablets, which allows for faster absorption of the drug. In 2006 and 2007, DiFalco and Shah worked together to develop a promising technology to deter abuse by preventing the rate of release of the drug from changing significantly if the tablets are crushed as compared to taking the tablets intact.[27]

In 2008, Aigner, DiFalco, and Shah formed Abuse Deterrent Pharmaceuticals LLC, which was renamed IDT in 2009, to develop pharmaceutical products, including abuse-deterrent opioid pain medications.[28] Aigner provided $1.2 million of initial capital while DiFalco and Shah contributed all patents and other intellectual

---

[24] Tr. 17 (Aigner).

[25] Tr. 18 (Aigner).

[26] Tr. 18 (Aigner).

[27] Tr. 549-50 (Shah); *see* Tr. 7 (Aigner).

[28] PTO ¶ 31; Tr. 552 (Shah).

property related to abuse-deterrent products.[29]  To document their contribution of intellectual property, DiFalco and Shah entered into Invention Assignment Agreements dated June 17, 2008.[30]

The contribution of intellectual property from DiFalco and Shah included MorphaBond and RoxyBond.[31]  MorphaBond is a monotherapy, abuse-deterrent, extended-release formulation of morphine sulfate; RoxyBond is a monotherapy, abuse-deterrent, immediate-release formulation of oxycodone hydrochloride.[32]  The FDA approved MorphaBond in November 2015 and RoxyBond in April 2017, but

---

[29] PTO ¶ 31; *see* Tr. 21-23 (Aigner); Tr. 552 (Shah).

[30] PTO ¶ 31.  A dispute arose over whether DiFalco and Shah attempted to alter the Invention Assignment Agreements to narrow the scope of the technology they assigned from all inventions they conceived "concerning or related to abuse deterrent technology" to all such inventions "concerning or related to tablet coated solid oral dosage form abuse deterrent technology."  JX 11 at 3, 10 (broader versions); JX 12 at 2, 8 (narrower versions). The evidence of record is too inconclusive to support such a finding.  According to Aigner, when organizing a data room in 2015, the Company could not find copies of the Invention Assignment Agreements and asked DiFalco to provide original copies.  The copies DiFalco provided were the narrower versions (JX 12), which prompted Aigner to accuse DiFalco and Shah of creating forged documents.  Tr. 35-39 (Aigner).  On the other hand, the broader versions (JX 11), which Aigner claimed to be the originals that DiFalco and Shah signed in 2008, contain a footer bearing the date "03/13/2015."  On cross-examination, Aigner could not explain this discrepancy, conceding that it "[d]oesn't make any sense."  Tr. 257 (Aigner).  In a March 2016 email that Aigner sent to DiFalco and Shah, Aigner characterized the matter as a "misunderstanding" and suggested they all "move on."  JX 13 at 1; Tr. 258-59 (Aigner).  New agreements were prepared "to eliminate the misunderstanding," which DiFalco and Shah signed.  JX 13 at 1; Tr. 702-03 (DiFalco). Also in 2016, DiFalco and Shah assigned to IDT a patent that originally had been filed in Cerovene's name that Aigner contends was covered by the Invention Assignment Agreements.  Tr. 40-42 (Aigner); Tr. 703-05 (DiFalco).

[31] PTO ¶ 31.

[32] PTO ¶ 31.

only MorphaBond, which was launched commercially in 2017, is available for sale today.[33] The abuse-deterrent technology that DiFalco and Shah invented could be applied to other drugs, but no other products have been developed by IDT or IDS to date.[34]

### D. Trygg Invests in IDT

On April 30, 2012, IDT entered into a letter agreement with Trygg IDT I LLC ("Trygg LLC")—a predecessor of Trygg—to establish a joint venture with, and secure financing from, Trygg LLC.[35] The purpose of Trygg LLC's investment was "to fund the development of the pharmaceutical products" by IDT.[36] Specifically, this meant financing the "pre-commercial activities" for three future IDT products with an option for the development of three additional products.[37] As part of its investment, Trygg LLC financed the build-out of improvements at a manufacturing facility located in Orangeburg, New York (the "Orangeburg Facility").[38]

Trygg LLC invested $10 million in IDT initially, with approximately $8 million earmarked for the Orangeburg Facility build-out, and it anticipated investing

---

[33] Tr. 8 (Aigner); Tr. 155 (Bodd).

[34] Tr. 557 (Shah).

[35] PTO ¶ 32; JX 3.

[36] Tr. 817 (Kramer).

[37] Tr. 817-18 (Kramer); PTO ¶ 32; *see* Tr. 700 (DiFalco).

[38] PTO ¶ 32.

9

approximately $30 million more "upon the successful reaching of milestones."[39]  In total, Trygg LLC and its successor (Trygg) invested over $45 million in IDT.[40]

### E.    The Trygg Dispute and Formation of IDS

In 2014 or 2015, "a major disagreement" arose between Trygg LLC and IDT over funding the development of additional products.[41]  From Trygg LLC's perspective, time had "run out" and it was "impossible" for Trygg LLC to justify making any further investment in IDT because of the company's lack of progress on many fronts, including that IDT was not even "finished with development [of its] two first products."[42]

Trygg LLC commenced arbitration proceedings against IDT, which the parties settled in August 2016.[43]  The details of the arbitration are confidential, but as a result of the settlement, IDT formed IDS into which Trygg LLC was merged, with IDS as the surviving entity.[44]  In connection with the merger, Trygg LLC's members became members of IDS, IDT became the majority member of IDS, and IDT contributed to IDS all of its intellectual property related to abuse-deterrent

---

[39] Tr. 816, 820 (Kramer).

[40] Tr. 817 (Kramer).

[41] Tr. 26 (Aigner); Tr. 159 (Bodd).

[42] Tr. 159 (Bodd).

[43] PTO ¶ 36; Tr. 30 (Aigner); JX 344.

[44] Tr. 26 (Aigner); PTO ¶ 36; JX 38.

products.[45]   IDS thereafter assumed all pharmaceutical development efforts previously undertaken by IDT.[46]  Also in connection with the merger, Trygg LLC transferred to IDS the assets on its balance sheet associated with the Orangeburg Facility and released IDT and its officers, including DiFalco and Shah, from any claims arising out of or related to the letter agreement under which Trygg LLC had funded the build-out of the Orangeburg Facility.[47]

The management and ownership structures of IDT and IDS after the settlement with Trygg LLC are depicted below based on their operative LLC agreements at the time:[48]

---

[45] PTO ¶ 36.  Trygg LLC's members at the time consisted of Trygg, Acela Investments LLC (affiliated with Aigner), Mininaste AS (affiliated with Bodd), Mario Family Partners, LP (affiliated with Ernest Mario), and Wold-Olsen.  PTO ¶¶ 33, 36.

[46] PTO ¶ 36.

[47] PTO ¶ 36; JX 344 § 1.2(b).

[48] The information for IDT comes from its Fourth Amended and Restated LLC Agreement dated as of August 23, 2016.  JX 39 § 5.2, Sched. 1.  The IDT membership percentages are calculated on a fully diluted basis, including non-voting profit interests.  The information for IDS comes from its Second Amended and Restated LLC Agreement dated as of September 28, 2016.  JX 44 § 5.02(a), Ex. A.  The IDS membership figures are based on common unit ownership.  All membership figures are rounded to the nearest tenth.

11

| IDT | | |
|---|---|---|
| *Managers* | *Members* | *Percentage* |
| Aigner | DiFalco and Shah (affiliated) | 38.8 |
| DiFalco | Aigner (affiliated) | 24.4 |
| Shah | Others | 15.7 |
| | Mininaste AS (Bodd) | 6.0 |
| | Wold-Olsen | 6.0 |
| | Mario (affiliated) | 4.9 |
| | SC Transition (Leduc) | 4.2 |

| IDS | | |
|---|---|---|
| *Managers* | *Members* | *Percentage* |
| Aigner | IDT | 71.9 |
| DiFalco | Trygg | 21.0 |
| Shah | SC Transition (Leduc) | 4.2 |
| Leduc | Mininaste AS (Bodd) | 1.0 |
| | Wold-Olsen | 1.0 |
| | Mario Family Partners, LP (Mario) | 0.5 |
| | Acela Investments LLC (Aigner) | 0.5 |

## F.     Continued Disputes over the Build-Out of the Orangeburg Facility

The resolution reached with Trygg LLC over the Orangeburg Facility did not end the disputes over that facility between Aigner and DiFalco and Shah. In mid-2016, before the dispute with Trygg LLC was resolved, Aigner discovered that Cerovene's landlord at the Orangeburg Facility was Corporate Drive Properties\Medlantis, LLC ("Medlantis"), a New Jersey limited liability company owned by DiFalco and Shah.[49] This surprised Aigner, who thought that a third party

---

[49] PTO ¶ 35; JX 4 at 1; JX 20; Tr. 43 (Aigner).

owned the facility.[50] Aigner later learned that Empire Construction Management Group, LLC, a company owned by DiFalco's brother, had billed approximately $4.5 million in connection with the build-out of the Orangeburg Facility.[51]

DiFalco oversaw the build-out of the Orangeburg Facility.[52] The arrangements for the build-out were informal. There was no contract governing the build-out between Cerovene and Trygg LLC or IDT, or between Cerovene and Empire.[53] According to DiFalco, his brother (Salvatore) acted as a general contractor on the project for "one or two years" and was paid $250,000 for his work.[54] When Salvatore's role ended, the cash in Empire's accounts was transferred to a company DiFalco owned called International Innovative Technologies Group, through which DiFalco completed the build-out project.[55] DiFalco acknowledges he "didn't have the greatest accounting of everything" for the build-out of the Orangeburg Facility, but insists that "millions of dollars" were saved on the project.[56]

---

[50] Tr. 43 (Aigner).

[51] Tr. 44 (Aigner); JX 21 at 1.

[52] PTO ¶ 34.

[53] Tr. 683, 795 (DiFalco); DiFalco Dep. 34.

[54] DiFalco Dep. 26-28, 34-35; Tr. 795-96 (DiFalco).

[55] Tr. 796 (DiFalco); DiFalco Dep. 34.

[56] Tr. 796-800 (DiFalco); DiFalco Dep. 218.

To date, the Orangeburg Facility has never been used to manufacture product for IDS.[57] Cerovene owns another facility located in Valley Cottage, New York (the "Valley Cottage Facility"), which was used to make test batches of MorphaBond and RoxyBond during the NDA process and which currently manufactures MorphaBond.[58]

## G. Initial Attempts to Address Conflicts of Interest

In the summer of 2016, in connection with making arrangements to manufacture products, Aigner, DiFalco, and Shah discussed ways to handle conflicts of interest arising from DiFalco and Shah's ownership of Cerovene.[59] On July 8, 2016, Robert F. Coyne, IDS's outside counsel at the law firm of Gibbons, P.C., emailed Aigner, DiFalco, and Shah: (i) drafts of a resolution "authorizing [DiFalco and Shah] to proceed with certain actions which involve a potential conflict of interest," including voting on a supply agreement with Cerovene that was being negotiated and participating in the selection of future CMOs; and (ii) draft language addressing conflicts of interest generally that was to be included in the operating agreements for IDT and IDS.[60] In general terms, the draft conflicts of interest language for the operating agreements identified Hafid Touam as "an independent

---

[57] Tr. 35, 78, 106 (Aigner); Tr. 697-98 (DiFalco).

[58] Tr. 82-83 (Aigner); JX 68 at 11; Tr. 682 (DiFalco).

[59] *See* JX 14.

[60] JX 17 at 1, 4.

14

party" who would vote for any manager who had a conflict of interest with respect to certain transactions.[61] Touam had worked with Aigner for many years dating back to 1999 or 2000, and had known DiFalco and Shah for a similar length of time.[62]

On August 8, 2016, Coyne emailed Aigner, DiFalco, and Shah a draft of a written consent for the members and managers of IDT to address past and current conflicts of interest involving IDT and Cerovene.[63] The draft written consent stated that DiFalco and Shah own Cerovene, "have an ownership and/or leasehold interest" in "buildings" being used for IDT's operations, and have employed and will continue to employ in connection with those buildings "companies in which family members related to" DiFalco and Shah have an "ownership interest."[64] The draft also contained a qualified waiver of claims against DiFalco and Shah relating to "any and all" conflicts, but it was not executed.[65]

On August 22, 2016, Aigner, DiFalco, and Shah executed a written consent as managers of the newly formed IDS to implement a "transparency policy."[66] The policy states that members and managers "engaged in business with the Company

---

[61] JX 17 at 1.

[62] Tr. 389-90 (Touam).

[63] JX 28.

[64] JX 28 at 10.

[65] JX 28 at 6-9.

[66] JX 37.

shall provide full disclosure and transparency in regard to such affiliated transaction, including supply chain issues and planning" and that "[a]ny potential conflict shall be disclosed completely and immediately in writing with attention to the Board."[67]

### H. The IDS Agreement

At the times relevant to this action, IDS has been governed by a Second Amended and Restated Limited Liability Company Agreement dated September 28, 2016 (the "IDS Agreement").[68] The "full and entire management of the business and affairs of" IDS is vested in a board of managers (as defined above, the "Board").[69] The IDS Agreement provides that "[p]rior to an IPO, the Board shall consist entirely of the individuals designated by the IDT Investors . . . , which initially shall be Stefan Aigner, Ray DiFalco, Manish Shah and Gerard Leduc."[70]

The IDS Agreement contains several provisions critical to this case that govern Board actions. Two provisions—one for actions taken at Board meetings and another for Board actions taken by written consent—expressly provide that no Board action shall be effective unless the action is approved by both (i) Aigner and (ii) either DiFalco or Shah (the "Veto Rights"). For example, Section 5.03, which governs actions taken at Board meetings, states as follows:

---

[67] JX 37 at 3.

[68] PTO ¶¶ 1, 37; JX 44.

[69] PTO ¶ 37; JX 44 § 5.01(a).

[70] JX 44 § 5.02(a).

A majority of the Managers then in office shall constitute a quorum for the transaction of business at any meeting, so long as such quorum shall include (a) Stefan Aigner and (b) at least one of Ray DiFalco or Manish Shah; provided that a quorum may only exist if proper notice of a meeting was provided in accordance with Section 5.07 (including to each Observer). Action of the Board shall be authorized by the vote of a majority of the Managers present at the time of the vote if there is a quorum, unless otherwise provided by this Agreement; *provided, however, that such majority shall include the affirmative vote of (i) Stefan Aigner and (ii) at least one of Ray DiFalco or Manish Shah*.[71]

The same requirement is included in a provision governing Board action taken by written consent.[72]

Section 5.14 provides that IDS's managers "shall have fiduciary duties of loyalty and care similar to that of directors of business corporations organized under the Delaware General Corporation Law."[73] Section 5.14 further provides a mechanism that was intended to address conflicts of interest. Specifically, Section 5.14(b)(ii) provides that an "Independent Representative" will exercise "voting, consent or similar rights as a member of the Board with respect to any Affiliate Transaction" in the place of an "Interested Manager," meaning one who has "a conflict of interest concerning an Affiliate Transaction."

---

[71] *Id*. § 5.03 (emphasis added).

[72] *Id*. § 5.09 ("Any action required or permitted to be taken by the Board may be taken without a meeting if a majority of the members of the Board, *which majority shall include (a) Stefan Aigner and (b) at least one of Ray DiFalco or Manish Shah*, consent in writing or by electronic transmission to the adoption of a resolution authorizing the action . . . .") (emphasis added).

[73] *Id*. § 5.14(a).

17

Section 5.14(b)(ii) names Touam as the initial Independent Representative for DiFalco and Shah, and Kip Martin as the initial Independent Representative for Aigner.[74] Martin worked with Aigner early in his career and is currently the Vice President of Finance and Business Development of IDS.[75] The text of Section 5.14 is discussed in detail later in this opinion.

Section 5.15 of the IDS Agreement provides that the Board may appoint officers and names Aigner as the initial Chief Executive Officer and DiFalco as the initial President.[76] Section 5.15 further provides that the performance of the duties of the CEO and President are not only subject to the control of the Board, but are subject to the "advice and consent" of each other:

> The Chief Executive Officer of the Company shall, subject to the control of the Board, in general supervise and control the business and affairs of the corporation *subject to the advice and consent of the President*. The President shall have such powers and duties as usually pertain to such office. The President's powers and duties shall be *subject to* the control of the Board and to *the advice and consent of the Chief Executive Officer*.[77]

In other words, the IDS Agreement contemplates a management structure in which the CEO and President are essentially co-equal fiduciaries who must communicate regularly and who share decision-making authority.

---

[74] *Id*. § 5.14(b)(ii).

[75] Tr. 461-63 (Martin).

[76] JX 44 § 5.15.

[77] *Id*. (emphasis added).

Finally, Section 5.16 of the IDS Agreement provides informational rights to the Board observers—currently Kramer and Aiello. It states, in relevant part, that:

> The Company shall, within a reasonable period of time after learning of any material development affecting the Company's or any of its direct or indirect Subsidiaries' business and affairs, update each of the Observers regarding any such material development. The Company agrees to, and to cause management of its Subsidiaries to, consider in good faith the recommendations of the Observers on matters on which it is consulted, recognizing that the ultimate discretion with respect to all matters shall be retained by the Company and its Subsidiaries.[78]

## I. The IDT Agreement

At the times relevant to this action, IDT has been governed by a Fourth Amended and Restated Limited Liability Company Agreement dated August 23, 2016 (the "IDT Agreement"),[79] which was entered into in connection with IDT's settlement with Trygg LLC. Section 5.1 of the IDT Agreement vests management and control of IDT in a board of managers, which consisted of Aigner, DiFalco, and Shah as of August 2016.[80]

Important here, the IDT Agreement provides that, prior to a transaction defined as the "Exchange," which has not occurred,[81] the managers of *IDS* cannot be removed or replaced without the approval of the IDT board, including the specific

---

[78] *Id.* § 5.16.

[79] JX 39.

[80] *Id*. § 5.1, Sched. 2 (list of initial managers).

[81] The "Exchange" involves an exchange of certain securities in IDT following a "Qualified Financing." *Id*. §§ 4.4(a), 4.6(a), App. I-4-5.

19

approval of Aigner (as the "Series B Manager") and either DiFalco or Shah (as the "Founder Members"):

> Section 5.4. <u>Major Actions</u>. The Company shall not commit any of the following acts without, in addition to any other vote required by law or this Agreement, the written consent or affirmative vote of the Board (including, prior to the Exchange, the Series B Manager and either one of the Founder Members) followed by the affirmative vote of the Members pursuant to Section 4.7.

* * * * *

> (w) any consent, vote, authorization ratification or approval by the Company with respect to its membership interest or rights in [IDS] related to or in connection with (i) any action described in Subsections (a) through (v) above, when undertaken or occurring at [IDS], mutatis mutandis; and (ii) the removal, replacement, or designation of the Company's managers in [IDS] (the initial managers in [IDS] are Stefan Aigner, Ray DiFalco, and Manish Shah).[82]

## J.     The Patheon, Cerovene, and Daiichi Agreements

In October 2016, the Board approved resolutions authorizing the Company to enter into three agreements pertaining to the manufacture and supply of products.[83] Under the first agreement, Patheon Pharmaceuticals Inc. was to provide development, tech transfer, and CMO services to IDS (the "Patheon Agreement").[84]

---

[82] *Id*. § 5.4(w); *see also id.* § 5.2(b)(i)(A) (designating Aigner as the initial Series B Manager), App. I-2 (defining "Founder Members" to mean DiFalco and Shah). The same form of approval is necessary to terminate or remove a manager of IDT. *Id.* § 5.4(r).

[83] JX 47; JX 49.

[84] JX 47; JX 46; Tr. 250-51 (Aigner).

IDS ran into problems transferring technology to Patheon, which has not manufactured any products for IDS to date.[85]

The second agreement, dated October 12, 2016, is a Product Validation and Supply Agreement with Cerovene (the "Cerovene Agreement").[86]  Under the Cerovene Agreement, Cerovene agreed to supply MorphaBond to IDS for a seven-year period at predetermined prices.[87]

The third agreement, dated October 21, 2016, is a licensing and supply agreement with Daiichi Sankyo, Inc. (the "Daiichi Agreement").[88]  Daiichi is an international pharmaceutical company based in Japan with significant operations in the United States.[89]  Under the Daiichi Agreement, IDS agreed to:  (i) provide MorphaBond to Daiichi in order for Daiichi to commercialize MorphaBond; and (ii) "co-promote" MorphaBond and RoxyBond with Daiichi, which means to use a "coordinated sales force" that is either "employed directly by" IDS or "through Third Parties" to market the products.[90]  In exchange, Daiichi agreed to make royalty and

---

[85] Tr. 77-78 (Aigner); Tr. 611, 615 (Shah).

[86] PTO ¶ 38; JX 48.

[87] JX 48 at 7, 27, 44; Tr. 69 (Aigner).

[88] PTO ¶ 39; JX 51.

[89] Tr. 19, 32 (Aigner).

[90] JX 51 §§ 1.16, 7.1; PTO ¶ 39; Tr. 510-11 (Innaurato).  Section 7.2(c) of the Daiichi Agreement gives IDS the right to opt out of the co-promotion obligation upon 180 days' written notice to Daiichi.

milestone payments to IDS.[91]  Daiichi also agreed to reimburse IDS for the cost of co-promotion.[92]  Significantly, the Daiichi Agreement made Daiichi "responsible for making all material decisions with respect to the transfer of MorphaBond and RoxyBond manufacturing to" another CMO "in consultation with" IDS if the transfer to Patheon "is no longer commercially reasonable."[93]

DiFalco and/or Shah signed the resolutions adopting and approving the Patheon, Cerovene, and Daiichi Agreements.[94]  Touam was not involved in these transactions as the Independent Representative under Section 5.14 of the IDS Agreement.[95]

## K.    The March 2017 Resolutions

On March 30, 2017, Aigner emailed Coyne, DiFalco, Shah and others copies of a series of written consents of the managers of IDS and, in one case, for IDT, to approve certain actions.[96]  In the email, Aigner instructed Coyne to hold the

---

[91] JX 51 §§ 8.1-8.3.

[92] *Id*. § 7.2; *see also* Post-Trial Tr. 132-34 (Dkt. 140).

[93] JX 51 § 6.8(c).

[94] *See* JX 47 at 3; JX 49 at 3.

[95] Tr. 251 (Aigner); *see* JX 44 § 5.14(b).

[96] Tr. 83-84 (Aigner); JX 68; *see also* JX 71 (April 17 email with copies of consents with additional signatures).

resolutions "in escrow until I . . . notify you that they should be released" (the "March

2017 Resolutions").[97]   Among other things, the written consents:

- Authorized distributions to each of the members of IDS;[98]

- Authorized employment agreements for certain IDS employees, including Aigner, Martin, Michael A. Innaurato (Chief of Commercial Operations), and Matthew Iverson (Vice President of Regulatory and Clinical Development), and bonus payments from IDS to Aigner, DiFalco, Shah, and others;[99]

- Acknowledged on behalf of IDS that DiFalco and Shah "diligently and efficiently supervised the construction of" improvements and infrastructure at the Orangeburg and Valley Cottage Facilities (the "Infrastructure") and resolved to "adopt, ratify, and approve of the actions taken by [DiFalco and Shah] and adopt and approve of the transfer and sale of any and all right, title and interest in the Infrastructure to Cerovene in consideration for Cerovene's forgiveness of" approximately $810,000 in payables IDS owed Cerovene (the "Infrastructure Resolution");[100]

- Authorized and approved "the negotiation and execution of a Development Agreement by and between [IDS] and Cerovene" for the development of two new drugs;[101] and

- Authorized IDT to make bonus payments to Martin, DiFalco, and Shah in the amount of $50,000 and to Aigner in the amount of $550,000, and to make additional bonus payments to approximately twenty Cerovene employees.[102]

---

[97] JX 68 at 1.

[98] *Id*. at 2.

[99] *Id*. at 6, 8, 10.

[100] *Id*. at 11-12.  The final signature page for the Infrastructure Resolution was obtained on April 18, 2017.  *See* JX 71 at 11-12; JX 75 at 2.

[101] JX 68 at 16, 19.

[102] *Id*. at 20, 22-23.

In addition to transferring the Infrastructure to Cerovene in exchange for forgiveness of about $810,000 that IDS owed Cerovene and putting to rest Aigner's grievance with DiFalco and Shah over the build-out of the Orangeburg Facility, the Infrastructure Resolution stood to benefit IDS by saving it approximately $500,000 per year in maintenance costs.[103]

On April 24, 2017, Aigner sent Coyne an email stating: "Just a reminder – *the IDS resolutions were a package deal*, and cannot be released yet until Trygg sign[s] off on all resolutions."[104] Martin, an officer of IDS who is subordinate to and has acted as a loyal supporter of Aigner, confirmed that the Infrastructure Resolution was part of a package deal with the other resolutions listed above.[105]

On May 2, 2017, Aigner sent Coyne an email purporting to "rescind" his consent to the Infrastructure Resolution and directing him to "regard it [as] null and void."[106] The email, which was not sent to DiFalco or Shah, states that Aigner was rescinding his consent "[g]iven new information" without explaining what the information was.[107] When asked in deposition to explain what the "new

---

[103] *Id*. at 12; Tr. 267-68 (Aigner).

[104] JX 77 (emphasis added).

[105] Tr. 490 (Martin); *see also* Tr. 718 (DiFalco).

[106] JX 84; Tr. 93-94 (Aigner).

[107] JX 84.

information" was, Aigner initially had no recollection and then refused to answer further questions on the subject through invocation of the attorney-client privilege.[108]

The court finds that the March 2017 Resolutions were a "package deal."[109] Nevertheless, Aigner implemented some of them—including the resolution awarding him a $550,000 bonus—while refusing to implement the Infrastructure Resolution.[110] Aigner provided no credible justification for doing this. Adding insult to injury, after Aigner caused IDS to renege on the Infrastructure Resolution, IDS failed to pay the $810,000 in payables and $500,000 in annual maintenance costs it owed Cerovene.[111]

## L.    Galephar Comes on the Scene

By July 2017, Aigner began considering Galephar Pharmaceutical Research, Inc., a pharmaceutical company based in Puerto Rico, as an alternative CMO to Patheon because IDS "had no success with Patheon."[112] Aigner concealed from DiFalco and Shah his exploration of Galephar as an alternative CMO. They only

---

[108] Aigner Dep. 334-35.

[109] Aigner equivocated at trial about whether the March 2017 Resolutions were a "package deal." *See* Tr. 275 (Aigner). His testimony on this point is not credible given, among other evidence, Aigner's own contemporaneous acknowledgement in writing that the March 2017 Resolutions were a "package deal." *See* JX 84.

[110] Tr. 276 (Aigner).

[111] Tr. 268-69 (Aigner); Tr. 719-21 (DiFalco).

[112] Tr. 100-02 (Aigner); Tr. 400 (Touam).

learned about it when Aaron Kramer, Trygg's CEO and a Board observer, forwarded to DiFalco an email Kramer received from Aigner on July 9, 2017, referencing a term sheet for Galephar.[113] Kramer forwarded the email to DiFalco because he believed "it was obviously something that should have been intended for the Board and the people involved in manufacturing and not just for me."[114]

Aigner was so upset with Kramer for bringing DiFalco and Shah into the loop that he tried to enlist Lindsay Goldberg, one of Trygg's joint venture partners, to have Kramer removed as an observer on the Board.[115] As discussed later in this opinion, Aigner's pursuit of Galephar became a significant point of controversy between him and DiFalco and Shah that bears directly on the deadlock between the parties with respect to which CMO IDS should recommend to Daiichi to manufacture IDS's products.

### M. The July 2017 Board Meeting

On July 14, 2017, IDS held a Board meeting at the New York offices of Lindsay Goldberg in which all the Board members (Aigner, DiFalco, Shah, and Leduc), Board observers (Kramer and Aiello), and Touam participated.[116] The night before the meeting, Aigner had sent Shah a "threatening letter," which set "a very

---

[113] Tr. 726 (DiFalco); Tr. 843 (Kramer); JX 104.

[114] Tr. 844 (Kramer).

[115] JX 113; Tr. 846 (Kramer).

[116] JX 111 at 1.

26

acrimonious tone" for the meeting.[117]  The parties had a "wide-ranging discussion" that focused on their grievances with each other.[118]  Aiello introduced the agenda, which began:  "The Board, which controls the full and entire management of the business and affairs of the Company, had become deadlocked."[119]

Aigner "indicated that Cerovene has failed to provide IDS with necessary information and updates on the status of the manufacturing."[120]  Shah expressed frustration that IDS had failed to support Cerovene's manufacturing efforts in connection with the Daiichi Agreement and indicated that he may "resign from IDS and take total control at Cerovene, while [DiFalco] focused solely on his roles at IDS."[121]  Shah then left the Board meeting "due to his extreme frustration."[122]

DiFalco "suggested that the Board composition be changed so as to break the deadlock."[123]  DiFalco:

> indicated that he needs four things for successful management of the product:  1) improved corporate governance, to be obtained by adding a Trygg representative to the Board, and putting Aaron Kramer in charge of the Company's IPO efforts, 2) the [transfer of the Infrastructure at the Orangeburg Facility to Cerovene], 3) direct dealings with [Daiichi] (as opposed to dealing with [Daiichi] through

---

[117] Tr. 840 (Kramer); *see* JX 111 at 2.

[118] JX 111 at 1.

[119] *Id.*

[120] *Id.* at 2.

[121] *Id.* at 2-3.

[122] *Id.* at 3.

[123] *Id.*

IDS) for the completion of the manufacturing batches, and 4) a development program, aka a new manufacturing agreement, between IDS and Cerovene for the development of future products.[124]

DiFalco reiterated that "the Company's corporate governance needs to be fixed" and "offered to guarant[ee] a successful manufacture of the batches" by Cerovene if Aigner agreed to a Board change.[125] "No formal vote was taken on any topic."[126]

After DiFalco and Shah left the meeting, Kramer implored Aigner to give DiFalco and Shah "what they're asking for" and said that the money at stake in Aigner's disagreements with DiFalco and Shah was "peanuts compared to the value of the Company."[127] Kramer credibly recounted Aigner's response, as follows:

> And [Aigner's] position was "*No. We need to starve them. We need to keep them hungry. We need to, you know, wield this big stick, the threat of litigation, of bankrupting them, and we need to starve them by, you know, delaying payments and not giving them what they want. That's the only way they're going to behave.*" And I think he used the term like you're going to get ray-gunned, that I was naïve in believing that by offering the carrot rather than the stick, that there would be some resolution, that – he was very certain that these are rotten guys and they're not able to manufacture the product.[128]

Kramer's testimony about Aigner's approach to dealing with DiFalco and Shah is consistent with the court's own assessment of his actions and motivations based on

---

[124] *Id*. at 4.

[125] *Id*. at 3-4.

[126] *Id*. at 6.

[127] Tr. 841-42 (Kramer).

[128] Tr. 842 (Kramer).

the entirety of the record. As an example, the court finds from the weight of the evidence that Aigner's decision to renege on the Infrastructure Resolution was not motivated by a desire to pursue what was in the best interest of IDS's business, but instead was motivated by Aigner's personal desire to retain the ability to threaten litigation against DiFalco and Shah concerning the Orangeburg Facility in order to exert leverage over them as part of an overall scheme to manage the Company unilaterally.

## N. Events Preceding the September 2017 Board Meeting

On August 22, 2017, DiFalco sent Aigner and others an email asking a series of due diligence questions concerning the possibility of using Galephar as a CMO for RoxyBond.[129] The next day, in an apparent act of retaliation, Aigner had IDS's counsel circulate to the Board for consideration two written consents (the "August 2017 Consents").[130] The first one purported to authorize the transfer of pharmaceutical manufacturing equipment from the Orangeburg Facility to Galephar.[131] The second one stated that Company "management other than [DiFalco and Shah] shall have the discretion to exclude and instruct all Company employees, advisors, and consultants to exclude [DiFalco and Shah] from communications

---

[129] JX 126.

[130] JX 128.

[131] *Id*. at 2-3.

relating to Affiliate Transactions."[132]  Touam signed both written consents later that day as the Independent Representative for DiFalco and Shah.[133]

On August 29, after speaking to DiFalco,[134] Touam circulated to Aigner, DiFalco, Shah, and others a revocation of his approval of the two written consents, stating:

> When I signed the Consents, I did so with the incorrect understanding that the Consents would be protecting Ray DiFalco and Manish Shah. I now understand that the Consents took rights away from Ray DiFalco and Manish Shah and would exclude Ray DiFalco and Manish Shah from communications which I believe they are entitled to receive under the IDS Agreement.  I thereby revoke my Consents, effective immediately.[135]

On September 8, 2017, Aiello emailed Aigner a proposed settlement term sheet intended "to resolve outstanding issues" in part by expanding the Board to five members, including Kramer.[136]  On September 10, DiFalco emailed the IDS managers, members, and observers an agenda for an upcoming Board meeting.[137] The agenda contained a number of proposals, including to discuss possible

---

[132] *Id*. at 6.

[133] JX 129 at 1 (email from Touam at 10:09 pm on August 23, 2017).

[134] Tr. 410-11 (Touam).

[135] JX 135 at 2.

[136] JX 148 at 1-2.

[137] JX 149.

manufacturing options for RoxyBond and to expand the Board to five managers with no veto rights and simple majority rule.[138]

On September 11, Aigner, Leduc, and Touam (as Independent Representative for DiFalco and Shah) signed a resolution purporting to authorize IDS to retain the law firm of Zuckerman Spaeder LLP to perform certain services (the "Zuckerman Resolution").[139] The Zuckerman Resolution states, in relevant part, that:

> IDS has a commercial relationship with Cerovene, Inc., a manufacturer and developer of pharmaceutical products that is owned and managed by Ray DiFalco and Manish Shah, who also have ownership interests and managerial responsibilities at IDS. Zuckerman is being engaged to take reasonable and necessary steps to provide legal advice to IDS regarding any situation with respect to Cerovene that creates or could create a conflict of interest for IDS and to ensure in light of this business relationship a decision-making process at IDS that provides for appropriate, independent and arms-length decisions that will protect IDS's interests and maximize shareholder value.[140]

The Zuckerman Resolution was circulated to the Board on the evening of September 11.[141] Over the next two days, before a Board meeting scheduled for September 15, DiFalco and Shah had a number of discussions with Touam expressing their disappointment that he signed the Zuckerman Resolution without

---

[138] *Id.* at 2.

[139] PTO ¶ 40; JX 153.

[140] JX 153 at 1-2.

[141] Tr. 416-17 (Touam).

31

speaking to them first and suggesting that he should resign as the Independent Representative.[142]

## O.    The September 2017 Board Meeting

On September 15, 2017, the Board met again at Lindsay Goldberg's offices.[143] Aigner, DiFalco, Shah, Touam, Kramer, Aiello, Martin, Tim Mergenthal (from Lindsay Goldberg), Coyne, Robert Johnson (from Gibbons), Yehuda Buchweitz and Adam Dickson (counsel for Trygg), and Aigner and DiFalco's personal lawyers all attended in person.[144] Leduc, Wold-Olsen, Ola Snove (of Aker AS), Bodd, and Keith James (IDS's Controller) participated telephonically.[145]

Kramer described the meeting as "a circus from the beginning to the end."[146] Aigner had invited attorneys from Zuckerman Spaeder to attend the meeting, but Aiello prevented them from entering the premises.[147]  According to minutes of the meeting, DiFalco explained that he had not approved retaining Zuckerman Spaeder and Kramer added that "[Aigner] and [Leduc] have a prior relationship with

---

[142] Tr. 416-18 (Touam); Tr. 793-94 (DiFalco).

[143] JX 162.

[144] *Id.* at 1.

[145] *Id.*; Tr. 336-37 (Aigner); Tr. 850 (Kramer).

[146] Tr. 851 (Kramer).

[147] JX 162 at 2.

Zuckerman Spaeder and therefore Zuckerman is not independent."[148] When an attorney for Trygg (Buchweitz) asked "who retained Zuckerman Spaeder," Aigner replied that he, Leduc, and Touam retained the firm on behalf of the Board under Section 5.14(b) of the IDS Agreement, to which Buchweitz responded that he interpreted that provision to require that DiFalco and Shah "first determine that they have a conflict and then disclose the facts concerning the conflicts of interest to the Board in order to determine that there is an Affiliate Transaction."[149] Aigner asserted "that conflicts of interest are the most important issue for the Company and are the cause of the deadlock."[150]

During the course of the meeting, the Board voted on seven proposals:

1. DiFalco, through his lawyer, proposed "that only Company Board members and Observers should be permitted to stay in the meeting as well as their legal counsel and Gibbons P.C., as Company counsel."[151]

2. DiFalco and Shah proposed "to expand the Company's Board from four (4) members to five (5) members, with none of the members having veto rights."[152]

---

[148] *Id.* In March 2018, a "revised" set of the minutes was prepared at the request of Aigner and Martin because "they did not want detailed minutes of everyone's grievances in the record book." JX 227; JX 230. The accuracy of the original minutes has not been questioned.

[149] JX 162 at 2-3.

[150] *Id.* at 2.

[151] *Id.* at 3.

[152] *Id.* at 8.

3. DiFalco proposed "for the Board to instruct Company counsel to release the [Infrastructure Resolution] from escrow."[153]

4. Aigner and DiFalco made several competing proposals regarding Zuckerman Spaeder. Aigner proposed to let the firm join the meeting, that the Board investigate whether DiFalco and Shah have a conflict of interest "as it relates to Cerovene," and "that the Board retain Zuckerman Spaeder . . . to advise the Board on conflicts of interest issues and process." DiFalco proposed to "formally fire Zuckerman (whose retention is disputed)."[154]

5. Aigner proposed to "send a delegation to the Galephar facility" including Shah and Touam to "make a determination of Galephar's product development and manufacturing capabilities and report back to the Board in ten (10) days. Within that same time, the Company shall choose 2 or 3 other CMO's to be evaluated as soon as possible."[155]

6. Someone proposed "[t]o remove the development equipment related to the manufacture of RoxyBond currently located at the [Orangeburg Facility] and [place it] in storage with a neutral party."[156]

7. DiFalco proposed "to combine [IDT] and [IDS] into one merged company."[157]

---

[153] *Id.* at 9.

[154] *Id.* at 10-11.

[155] *Id.* at 12.

[156] *Id.*

[157] *Id.* at 13.

Only the fifth and sixth proposals passed.[158]  Aigner vetoed the second, third, and seventh resolutions, which were supported by the three other Board members: DiFalco, Shah, and Leduc.[159]

During the Board meeting, Kramer stated that Aigner had been "trying to use" the Affiliate Transaction provision of Section 5.14(b) "to effectively push Mr. Shah and Mr. DiFalco out of [the] decision-making" process.[160]  At some point during the meeting, Aigner's lawyer "said that [Aigner] would be willing to give up his veto rights in certain circumstances and that they would give us a proposal in writing" within a number of days, but Aigner never did so.[161]

At the end of the September 15 Board meeting, Touam orally resigned as Independent Representative.[162]  A few days later, on September 20, Touam wrote to the Board, stating:  "I no longer wish to serve as an Independent Representative as that term is defined under Section 5.14(b)([ii]) of the IDS Operating Agreement.  I hereby rescind my signature on the IDS Board written consent of September 11th 2017, engaging the Zuckerman law firm."[163]

---

[158] *Id*. at 12-13.

[159] *Id*. at 9, 13-14.

[160] Tr. 852 (Kramer); JX 162 at 4.

[161] Tr. 854 (Kramer).

[162] Tr. 419 (Touam); JX 162 at 15.

[163] JX 163; Tr. 419 (Touam).

## P. Aigner Tries to Outflank DiFalco by Reaching Out to Shah

After the September 2017 Board meeting, Aigner reached out to Shah repeatedly in an effort to get Shah to take his side. It is not surprising that Aigner focused on Shah. A scientist by training, Shah displayed a calm and non-confrontational demeanor at trial in sharp contrast to the combative attitude that Aigner and DiFalco displayed. Aigner's effort to appeal to Shah ultimately failed and led Shah to resign from the Board and his position as Chief Science Officer.

On October 23, 2017, Aigner's counsel wrote to Shah's counsel, requesting that Shah meet with Aigner or his designee and without DiFalco in order "to discuss a productive path forward."[164] The letter criticized "certain actions by or on behalf of Ray DiFalco" and stated that "[i]f Mr. Shah is not forthcoming in response to this letter he is likely to become the target of further investigation" and that the letter may not be disclosed to Lindsay Goldberg or Trygg, IDS's major investors.[165] A copy of the letter "was delivered by messenger" to Shah's house during dinnertime with his wife, which distressed Shah.[166] Shah read the letter to mean that Aigner

---

[164] JX 184 at 2.

[165] *Id*. at 2, 5; Tr. 585-86 (Shah).

[166] Tr. 581 (Shah).

36

would investigate and sue him unless he met with Aigner.[167] Shah also asked Aigner to stop making deliveries to his home, but Aigner "repeatedly kept doing it."[168]

In early November 2017, Shah and Aigner met in New York with their lawyers.[169] During the meeting, when the lawyers had left the room, Aigner confirmed that his purpose for meeting with Shah was to get DiFalco out of the Company.[170] After the meeting, between Christmas and the New Year, Shah's lawyers worked to put together a "comprehensive" set of proposals "to take the Company forward" that were sent to Aigner and his lawyers, but no progress was made.[171]

On May 15, 2018, Gibbons, IDS's outside counsel, emailed the Board a "draft IDS Resolution appointing Navin Advani as a replacement Independent Representative for Manish Shah and re-appointing Hafid Touam as Independent Representative for Ray DiFalco."[172] DiFalco responded the next day, saying "this is the first time I am seeing [this] resolution," "I find it rather disturbing that it is being circulated without any review on my part," and "I have NOT chosen Hafid to

---

[167] Tr. 580 (Shah).

[168] Tr. 581 (Shah).

[169] Tr. 583 (Shah).

[170] Tr. 584-85 (Shah).

[171] Tr. 586-87 (Shah).

[172] JX 254 at 2.

represent me at this time."[173] On May 17, 2018, Aigner emailed IDS's lawyers at Gibbons, DiFalco, Shah, Touam, and Martin, stating: "At this point please cease all activities on the release and other bundled resolutions. Currently there is no path forward for a global solution."[174]

On May 30, 2018, Shah emailed Aigner, DiFalco, Leduc, Touam, and others a series of proposed resolutions as "an honest effort to move IDS further."[175] The main resolution was an "omnibus" resolution to approve six agreements including: (i) consulting agreements between IDS and each of DiFalco and Shah; (ii) an agreement between Galephar and IDS for Galephar to provide development and tech transfer services to IDS; (iii) an amendment to the Cerovene Agreement providing, among other things, that Cerovene "shall give priority to the manufacture of MorphaBond"; (iv) a master development agreement for Cerovene to develop three new drugs for IDS; and (v) a general release and purchase agreement between IDS and Cerovene regarding the Orangeburg Facility.[176] Aigner rejected Shah's package of proposals, which he thought should not be "bundled."[177]

---

[173] *Id*. at 1.

[174] JX 255 at 1.

[175] JX 258 at 2.

[176] *Id*. at 1, 42, 65; Tr. 212-13 (Aigner).

[177] Tr. 220 (Aigner).

On June 26, 2018, Aigner sent an email addressed only to Shah with the subject line, "Time to think carefully," which stated:

> We are at a cross roads here. If you resign you are closing doors on potential solutions which in my opinion will leave no other path than litigation. If you want to avoid being part of it, a resignation from the IDS or IDT Board is the last thing you want to do. It is time to think carefully which side you want to be on and what you want your future to be . . . .[178]

Ignoring Shah's prior request, Aigner had a copy of this email delivered to Shah's home.[179]

On July 6, 2018, Shah's lawyer contacted Aigner saying that if he did not agree to the bundle of resolutions by the end of the day, Shah "would resign from the Board."[180] After Aigner did not agree, Shah resigned as a manager of IDS and IDT later that day in a letter addressed to "IDS/IDT Board and Members."[181] The letter stated that Shah's resignation "is contingent on Ray DiFalco retaining his 'veto power' over Board action unless and until the corporate governance structure is revised" and that he wanted to

> confirm that any individual appointed to replace me as a Manager of IDS does not fully step [into] my shoes, in the sense that he does not assume my authority under Section 5.03, and therefore that any future Board action requires the affirmative vote of Stefan and Ray (again, pending revision of that entire governance structure). I am delivering

---

[178] JX 271 at 1.

[179] Tr. 594 (Shah).

[180] Tr. 221-22 (Aigner).

[181] Tr. 222 (Aigner); JX 277.

39

a copy of this Resignation to Gibbons, corporate counsel for IDS, seeking their confirmation of this interpretation. If they disagree, please consider this Resignation voided and of no force or effect, and thereby rescinded.[182]

Also on July 6, Aigner sent DiFalco and Shah a notice of dispute in anticipation of filing this action, which listed as one of the "disputed issues" "Manish Shah's further breach of fiduciary duty in threatening to resign as a member of the board of IDS and IDT if the other board members did not agree to provide certain personal benefits to him, Ray DiFalco, and their affiliated companies."[183] The notice arrived by messenger at Shah's home "minutes" before Shah resigned.[184] Aigner filed this action a few weeks later, on July 27, 2018.[185]

## Q. Post-Filing Events

On August 16, 2018, in advance of a Board meeting scheduled for August 22, Aigner circulated a presentation describing the current state of IDS.[186] The presentation stated that IDS's year-to-date revenues from Daiichi through June 2018 were approximately $2.9 million, and that total expenses for the same period were

---

[182] JX 277.

[183] JX 280 at 1-2; Tr. 598-99 (Shah).

[184] Tr. 598-99 (Shah).

[185] Dkt. 1.

[186] JX 292.

approximately $7.4 million.[187]  As of trial, IDS was expected to have a negative cash flow of approximately $6 million for all of 2018.[188]  According to the presentation, IDS's cash balance by the fourth quarter of 2019 was projected to be approximately $4.1 million and thus "IDS can only afford limited R&D activities until fund raising can be completed."[189]

On August 23, 2018, the day after the Board meeting, DiFalco circulated an email criticizing Aigner for unilaterally breaking the quorum for the meeting before the Board could address "many of the pressing issues included on the agenda" and stating that "[t]he company, as it stands now, is still operating without a board-approved budget, and without board approval for many of the transactions in which the company is engaged."[190]  DiFalco also proposed a Board resolution to appoint Arthur Bedrosian, a pharmaceutical company executive, as an Independent Representative to fill the vacancy left by Touam's resignation.[191]  The Board did not act on this proposal even though Aigner's original complaint in this action asserted that "[t]he IDS Operating Agreement and Delaware law require DiFalco and Shah

---

[187] *Id*. at 30-31.  IDS's revenues to date have come from the Daiichi Agreement.  *See* Tr. 306 (Aigner); Tr. 858 (Kramer).

[188] Tr. 499 (Martin).

[189] JX 292 at 34, 36.

[190] JX 297 at 1.

[191] *Id*. at 1, 6, 9-10.

to nominate or approve an Independent Representative to" fill the vacancy created by Touam's resignation and sought injunctive relief directing them to do so.[192]

On September 14, 2018, Aigner sent an email to the Board and various IDS members with the subject line: "Hafid Touam reassuming his role as Independent Representative for Ray."[193] Attached to the email was a signed statement from Touam, which said: "I, Hafid Touam, hereby rescind my letter of resignation as Independent Representative . . . and state that I am willing and able to resume my service as an Independent Representative pursuant to Section 5.14 of the" IDS Agreement.[194] A written consent of the Board was drafted to reinstate Touam but it was never approved.[195]

On September 19, 2018, DiFalco filed counter- and third-party claims seeking judicial dissolution of IDS, appointment of a liquidating trustee, and declaratory and injunctive relief.[196] On September 21, 2018, Aigner had a letter and a draft of an amended complaint delivered to Shah's house, once again by messenger.[197] In the manner of a bully, Aigner threatened that the litigation could affect Shah's family:

---

[192] Tr. 351 (Aigner); Dkt. 1 ¶¶ 64-67.

[193] JX 313 at 1.

[194] *Id*. at 2.

[195] JX 311 at 1, 4; Tr. 358 (Aigner).

[196] Dkt. 17 ¶¶ 182-215.

[197] JX 320; Tr. 601 (Shah).

In my original complaint, I only brought limited claims for rulings on the agreement so the Company could move forward. It is unfortunate that the whole development is now where it is. I always had a feeling that you and I were trying to move IDS forward, but at this point [DiFalco's] counterclaims *push me to file an amendment . . . which could affect you and your family*.

The attached filing, which my lawyers shared with yours, will be filed Wednesday unless we find a solution before, which I know we could do, but appears unlikely given [DiFalco] and his lawyers' responses to date. Please review it with your personal counsel.[198]

On October 15, 2018, Shah resigned as an officer of IDT and IDS.[199]  On November 3, 2018, Aigner emailed DiFalco what he described as "a duly enacted resolution discharging Ray DiFalco as President of IDS effective today" that was signed by Aigner, Leduc, and Touam.[200]

On November 28, 2018, Aigner and Leduc signed a set of three written consents for the IDS Board:  (i) authorizing and approving a Master Development Services Agreement with Galephar; (ii) stating that the Board, except DiFalco, opposes dissolution of IDS; and (iii) purporting to elect Roelof Rongen as a manager of IDS (the "November 2018 Resolutions").[201]  Touam signed the first two resolutions as well.[202]  Rongen is a former employee and "close friend" of

---

[198] JX 320 (emphasis added).

[199] PTO ¶ 22.

[200] JX 323 at 1, 4-5.

[201] JX 332 at 1, 5-6, 8.

[202] *Id*. at 3, 7.

43

Aigner's.[203] The first resolution states that it shall be of no effect if it is determined in this action that Touam is not a valid Independent Representative for DiFalco and the third resolution references that the question of whether Rongen inherits Shah's voting rights under the IDS Agreement is an issue in this action.[204]

On November 30, 2018, the FDA sent Daiichi a "Complete Response" letter stating that the FDA "cannot approve" Daiichi's NDA for RoxyBond, dated August 1, 2018, which "proposes [the] addition of" Galephar as a manufacturing site.[205] The letter also stated that "[d]uring a recent inspection of Galephar . . . , our field investigator observed objectionable conditions at the facility," and listed a number of specific steps Daiichi should take to rectify the situation.[206] At the time, DiFalco had "never even seen" a Complete Response letter issued in connection with a tech transfer.[207]

---

[203] Tr. 864 (Kramer).

[204] JX 332 at 2, 8.

[205] JX 338 at 4, 6. The FDA sends Complete Response letters "if the agency determines that [it] will not approve the application . . . in its present form" for various reasons, including that the "methods to be used in, and the facilities and controls used for, the manufacture, processing, packing, or holding of the drug substance or the drug product are inadequate to preserve its identity, strength, quality, purity, stability, and bioavailability." 21 C.F.R. §§ 314.110, 314.125.

[206] JX 338 at 4-5.

[207] Tr. 777 (DiFalco). At Daiichi's request, Cerovene has not been involved in the tech transfer of RoxyBond to Galephar. Iverson Dep. 43. As of trial, Daiichi and IDS had been working with another CMO called Catalent to manufacture RoxyBond, but the status of that effort is unclear from the record. *See* Tr. 614-16 (Shah); Tr. 881 (Kramer).

After trial, on January 7, 2019, the FDA issued a second Complete Response letter.[208]  The second letter is substantively the same as the first but concerns a different (fifteen milligram) dosage of RoxyBond.[209]

## II.    PROCEDURAL HISTORY

After this action was filed on July 27, 2018, Aigner amended his complaint three times, culminating in a third amended complaint filed on December 8, 2018 (the "Complaint").[210]  On September 19, 2018, DiFalco and Shah filed an answer to an earlier pleading and DiFalco filed three counterclaims and third-party claims seeking the same relief against Aigner and IDS, respectively (the "Counterclaim").[211]

The Complaint asserts six claims:  (1) breach of fiduciary duty for damages; (2) fraud; (3) breach of contract; (4) declaratory relief; (5) a second claim for breach of fiduciary duty; and (6) breach of the IDS Agreement and its transparency policy. The Counterclaim asserts three claims for:  (1) judicial dissolution of IDS under 6 *Del. C.* § 18-802; (2) appointment of a liquidating trustee under 6 *Del. C.* § 18-803; and (3) declaratory and injunctive relief.

---

[208] Def.'s Reply Br. Ex. A (Dkt. 126).

[209] *Id.* at 1; JX 338 at 4.

[210] Dkt. 108.

[211] Dkt. 17.

45

On November 13, 2018, the parties agreed to bifurcate their claims so that the only claims to be tried initially would be Aigner's claim for declaratory relief (the fourth cause of action in the Complaint) and the three claims in DiFalco's Counterclaim.[212] Although Aigner's articulation of the declaratory relief he seeks has shifted from time to time, his post-trial brief seeks four declarations along the following lines, *i.e.*, that:

1. Section 5.14 of the IDS Agreement bars DiFalco from using his Veto Rights on the selection of CMOs or development partners;

2. Touam validly rescinded his resignation as Independent Representative and is currently authorized to act as an Independent Representative under Section 5.14 of the IDS Agreement;

3. The Zuckerman Resolution was validly approved and not revoked; and

4. Rongen was validly elected as a manager of IDS and assumed Shah's Veto Rights.[213]

---

[212] Dkt. 69 at 30; *see also* PTO ¶ 15.

[213] Pl.'s Opening Br. 38, 46, 50, 52 (Dkt. 135). The Complaint and the Pre-Trial Order sought some additional or differently worded declarations. *See, e.g.*, Compl. ¶ 138 (seeking declaration "that individuals that are not managers (or Observers or Independent Representatives, in the case of IDS) are not entitled to attend board meetings unless such individuals are invited to attend by appropriate action of the board"); PTO ¶ 87 (seeking declaration that "DiFalco is conflicted for purposes of Section 5.14 of the IDS Agreement with respect to any decision by the Board relating to this litigation or his claim for dissolution"); PTO ¶ 88 (seeking declaration "that only Managers and Observers may attend meetings of the Board unless the Board votes to permit others to attend"). To the extent any declaration sought in the Complaint or Pre-Trial Order was not addressed in Aigner's opening post-trial brief, such request for relief is waived. *See Emerald P'rs v. Berlin*, 726 A.2d 1215, 1224 (Del. 1999) ("Issues not briefed are deemed waived.").

On November 16, 2018, Aigner sought injunctive relief to require DiFalco and Shah to provide documents to IDS's auditor, BDO USA, LLP, concerning the build-out of the Orangeburg Facility. According to Aigner, BDO had sought these documents to complete its review of the financial statements of IDS and IDT for 2016 and 2017.[214] On December 6, 2018, the court denied Aigner's request for injunctive relief, which was not the subject of any claim in Aigner's pleading at the time, but permitted him to amend his pleading to add such a claim in order to litigate the issue at trial if he wished to do so.[215]

On December 7, 2018, Daiichi filed a motion to intervene in this action.[216] The motion was focused on protecting Daiichi's interests if the court ordered dissolution. Accordingly, the motion was placed in abeyance pending the court's ruling on whether IDS should be dissolved.[217]

A three-day trial was held from December 10-12, 2018. Post-trial argument and submissions were completed by March 15, 2018.

---

[214] Dkt. 53 at 1-2.

[215] Dkt. 115 at 46-56.

[216] Dkt. 107.

[217] Dkt. 130 at 140-42.

## III. ANALYSIS

Unless otherwise indicated below, the proponent of each claim has "the burden of proving each element, including damages, of each" cause of action "by a preponderance of the evidence."[218] "[P]roof by a preponderance of the evidence means that something is more likely than not."[219] For purposes of the following analysis, the court refers primarily to DiFalco, rather than to DiFalco and Shah, in addressing issues of deadlock for simplicity and given Shah's resignation as a manager of IDS and IDT before trial.[220]

The core issue in this case is whether it is reasonably practicable for IDS to carry on its business in accordance with the IDS Agreement. Before analyzing this issue, the court will address two declarations Aigner seeks in order to clarify the current state of the governance of IDS: Aigner's request for declarations (1) that Touam is currently authorized to act as DiFalco's Independent Representative under Section 5.14 of the IDS Agreement on the theory that he validly rescinded his resignation, and (2) that Rongen was validly elected as a manager of IDS and assumed Shah's voting rights under the IDS Agreement.

---

[218] *Physiotherapy Corp. v. Moncure*, 2018 WL 1256492, at *3 (Del. Ch. Mar. 12, 2018) (citation and internal quotation marks omitted).

[219] *Id.*

[220] PTO ¶ 22; JX 277.

The issues addressed in this opinion all turn on the contractual interpretation of provisions in the IDS Agreement, which is governed by Delaware law.[221] The court's "task is to fulfill the parties' shared expectations at the time they contracted, but because Delaware adheres to an objective theory of contracts, the contract's construction should be that which would be understood by an objective, reasonable third party."[222] "The contract must also be read as a whole, giving meaning to each term and avoiding an interpretation that would render any term 'mere surplusage.'"[223] "If a contract is unambiguous, extrinsic evidence may not be used to interpret the intent of the parties, to vary the terms of the contract or to create an ambiguity."[224] "A contract is not rendered ambiguous simply because the parties do not agree upon its proper construction."[225] "If, after applying these canons of contract interpretation, the contract is nonetheless reasonably susceptible [to] two or more interpretations or may have two or more different meanings, then the contract

---

[221] JX 44 § 13.03.

[222] *Leaf Invenergy Co. v. Invenergy Renewables LLC*, 2019 WL 1965888, at *6 (Del. May 2, 2019) (internal quotation marks and alterations omitted).

[223] *Sunline Commercial Carriers, Inc. v. CITGO Petroleum Corp.*, 2019 WL 1068183, at *8 (Del. Mar. 7, 2019).

[224] *Eagle Indus., Inc. v. DeVilbiss Health Care, Inc.*, 702 A.2d 1228, 1232 (Del. 1997).

[225] *Rhone-Poulenc Basic Chem. Co. v. Am. Motorists Ins. Co.*, 616 A.2d 1192, 1196 (Del. 1992).

is ambiguous and courts must resort to extrinsic evidence to determine the parties' contractual intent."[226]

## A. Touam Ceased to Be an Independent Representative When He Resigned from the Position in September 2017

It is stipulated that (i) Touam was the person designated in Section 5.14 of the IDS Agreement as the Independent Representative for DiFalco and Shah in situations involving conflicts of interest, (ii) he orally resigned from this position on September 15, 2017, and (iii) he confirmed his resignation in writing by letter dated September 20, 2017.[227] That letter stated: "I no longer wish to serve as an Independent Representative as that term is defined under Section 5.14(b)([ii]) of the IDS Operating Agreement."[228] The record thus reflects that Touam resigned from his position as Independent Representative unconditionally as of September 15, 2017.[229] Despite these established facts, Aigner advances essentially two arguments for why the court should declare that Touam is currently authorized to act as the Independent Representative for DiFalco under Section 5.14. Both arguments fail.

---

[226] *Sunline*, 2019 WL 1068183, at *8 (citation and internal quotation marks omitted).

[227] PTO ¶ 26.

[228] JX 163.

[229] *See Rypac Packaging Mach. Inc. v. Coakley*, 2000 WL 567895, at *5 (Del. Ch. May 1, 2000) (director and officer resigned as of date he told another officer he "was resigning," which was about two months before he submitted a formal resignation letter).

First, Aigner contends as a factual matter that DiFalco and Shah improperly pressured Touam to resign so that the "only equitable result would be to put the parties back in the position they were *ex ante*" by declaring that Touam shall be DiFalco's Independent Representative "so long as he is willing and able" to perform that task.[230] Aigner fails to identify any legal authority or specific provision of the IDS Agreement to support this type of request. Putting that aside, the argument fails because its factual premise is not supported by the record.

It is correct, as Aigner points out, that Touam testified that he would not have resigned in September 2017 if DiFalco and Shah had not asked him to do so.[231] But Touam also testified credibly that DiFalco and Shah never threatened or coerced him into resigning and that he made the decision to resign because he did not want to continue to be put in the middle of a "difficult situation" between Aigner, on the one hand, and DiFalco and Shah, on the other hand—all of whom Touam had known for many years and considered to be friends.[232]

It is entirely understandable that Touam would reach this conclusion given the evident animosity and lack of trust that pervaded the relationship between Aigner and DiFalco and Shah in the months leading up to his resignation. In particular,

---

[230] Pl.'s Reply Br. 27 (Dkt. 128); Pl.'s Opening Br. 47.

[231] Tr. 419 (Touam).

[232] Tr. 438-40 (Touam); *see also* Touam Dep. 181-82, 185-86; Tr. 793-94 (DiFalco); Tr. 653 (Shah).

Aigner had been asking Touam to approve written consents purporting to authorize actions on behalf of DiFalco and Shah only to learn after the fact that they took exception to them, and for legitimate reasons. Aigner employed this tactic in connection with the August 2017 Consents, which caused Touam to revoke his signature after realizing the consents took rights away from DiFalco and Shah,[233] and in connection with the Zuckerman Resolution, where legitimate questions were raised about Aigner and Leduc's past relationship with the law firm. Based on the preponderance of the evidence, including Touam's testimony, the court finds that Touam's resignation in September 2017 was voluntary and that DiFalco and Shah did not act in an improper manner with respect to Touam's resignation that would justify reinstating him as Independent Representative by equitable decree.[234]

Second, Aigner contends that Touam resumed his position as an Independent Representative on September 14, 2018, when he purported to rescind his resignation.

---

[233] JX 135 at 2.

[234] In *Godden v. Franco*, the court found that an "Independent Manager" provision in an LLC agreement "envisions ongoing independence" and not just independence at the time of election and that "the implied covenant of good faith and fair dealing would prohibit either side from co-opting the Independent Manager after he was selected." 2018 WL 3998431, at *16 (Del. Ch. Aug. 21, 2018). Here, although the evidence is too obscure to support any definitive findings, it appears that Touam may have been offered opportunities that could have affected his independence in the direction of both factions at various times. *See* Tr. 411-13 (Touam); JX 147 at 1 (referencing potential employment opportunity for Touam at Cerovene); Tr. 424-26 (Touam); JX 299 (discussing promise Aigner, DiFalco, and Shah collectively made to pay Touam a $275,000 bonus if "Galephar delivers RoxyBond before end of August 2018").

52

According to Aigner, this is because "there is no provision [in the IDS Agreement] for Touam to resign permanently" and thus he "could be 'unable or unwilling' at one point in time (*e.g.*, ill or out of the country) but willing and able at other times" to serve as an Independent Representative.[235] In other words, as Aigner sees it, Touam was free to oscillate in and out of the role of Independent Representative at will and thus was free to return to the position when he purported to rescind his resignation without even obtaining Board approval. The fundamental flaw in this novel argument is that it cannot be squared with the plain language of the IDS Agreement.

Section 5.14(b)(ii) of the IDS Agreement states, in relevant part, that Touam "shall" exercise DiFalco's voting rights when DiFalco is an Interested Manager and that "[i]n the event" that "Touam is unwilling or unable to serve as an Independent Representative, *the Board shall appoint a replacement*."[236] The italicized language supports the conclusion that, upon indicating an unwillingness to serve,[237] Touam relinquished and could not unilaterally resume the position of Independent Representative because, in that circumstance, the Board is obligated to appoint a

---

[235] Pl.'s Opening Br. 46.

[236] JX 44 § 5.14(b)(ii).

[237] Indicating an unwillingness to serve is substantively the same as resigning in my view. For this reason, I disagree with Aigner's bizarre suggestion that the IDS Agreement does not permit "Touam to resign permanently" based on the fact that Sections 5.11 and 5.12 permit a manager to "resign at any time" and be replaced by the remaining members of the Board. *See* Pl.'s Opening Br. 46-47.

replacement. This interpretation is bolstered by the absence of any language in the IDS Agreement (i) suggesting that an Independent Representative could *resume* that role after a period of unwillingness to serve or (ii) making conditional the tenure of a "replacement" so as to provide an opening for an Independent Representative to resume the position automatically if he wished to do so.

In short, it would make no sense for the IDS Agreement to require that the Board "appoint a replacement" without qualification after an Independent Representative indicates he is unwilling or unable to serve if, as Aigner contends, the intent of the provision was to allow the Independent Representative to pop in and out of the position of his own accord. Rather, Section 5.14 plainly contemplates a binary situation, *i.e.*, either the Independent Representative occupies the position and thus is available to vote for an Interested Manager when necessary or, if he becomes unwilling or unable to serve, he is out of the position and a replacement is to be put in his place. The provision is equally unequivocal that Board action is necessary to fill a vacancy after an Independent Representative becomes unwilling or unable to serve.

Notably, Aigner, DiFalco, and Shah each recognized—before *and after* this litigation began in July 2018—that this is how Section 5.14 was intended to operate because they both attempted to fill the Independent Representative position that Touam vacated in 2017 *through Board action*. On May 15, 2018, IDS's counsel

circulated a draft resolution to reappoint Touam as Independent Representative for DiFalco and Shah.[238]  On September 7, 2018, about one week before Touam purported to rescind his resignation, Aigner circulated a written consent of the Board to "approve of the reappointment of Hafid Touam to serve as the Independent Representative" in order to authorize an amendment of the Cerovene Agreement.[239] Similarly, on September 15, 2018, a day after Touam purported to rescind his resignation, Aigner circulated a draft resolution of the Board to "acknowledge that Hafid Touam shall resume his service as Independent [Representative] pursuant to Section 5.14 of the [IDS] Agreement."[240]  If Aigner believed that the IDS Agreement permitted Touam to resume his role as Independent Representative unilaterally, circulating these resolutions would have been unnecessary.

For his part, DiFalco twice attempted to fill the vacancy created by Touam's resignation as Independent Representative through Board action.  The first attempt was on October 23, 2017, when DiFalco asked the Board to approve Navin Advani to replace Touam as the Independent Representative for himself and Shah under

---

[238] JX 254 at 2.

[239] JX 307 at 2-3.  This was Aigner's second line of attack to fill the vacancy created by Touam's resignation.  As noted above, Aigner's initial complaint sought injunctive relief requiring "DiFalco and Shah to nominate or approve an Independent Representative" to fill the vacancy.  Dkt. 1 ¶¶ 64-67.

[240] JX 310 at 2; JX 311 at 1-2.

Section 5.14.[241] The second attempt was on August 23, 2018, when DiFalco circulated a written consent of the Board to appoint Arthur Bedrosian as Touam's replacement under Section 5.14.[242] Finally, Shah sought to reappoint Touam as the Independent Representative through Board action, albeit for the sole purpose of authorizing certain resolutions in May 2018 that Shah proposed in an effort to resolve the disputes with Aigner.[243]

In sum, even if Section 5.14(b)(ii) were ambiguous, which it is not in the court's opinion, the parties' course of conduct demonstrates their shared understanding that Board action is necessary to fill a vacancy of the Independent Representative position and that a person who resigned from that position cannot unilaterally reinstate himself by purporting to rescind his resignation.[244]

\* \* \* \* \*

For the reasons explained above, under the plain language of Section 5.14, Touam has had no authority to serve as an Independent Representative since September 15, 2017, when he unequivocally expressed his unwillingness to serve in that role. Three consequences flow from this ruling. First, Aigner's request for a

---

[241] JX 185.

[242] JX 297 at 6.

[243] JX 258 at 97.

[244] *See In re Viking Pump, Inc.*, 148 A.3d 633, 648 (Del. 2016) ("When construing ambiguous contractual provisions, Delaware courts are permitted to consider the parties' course of dealing.").

declaration that Touam is currently authorized to serve as an Independent Representative must be denied. Second, the November 3, 2018 written consent terminating DiFalco as President, which Touam purported to sign as an Independent Representative on behalf of DiFalco, is invalid.[245] Third, the November 28, 2018 written consent approving a Master Development Services Agreement with Galephar, which was conditioned on the court determining that Touam was authorized to act on behalf of DiFalco, is of no force or effect by its own terms.[246]

## B. Rongen Was Not Validly Elected as a Manager of IDS and Would Not Have Assumed Shah's Voting Rights Even if He Were

Aigner requests a declaration that "Rongen should be confirmed as a manager of IDS with Shah's voting rights."[247] This request implicates two questions: (1) was Rongen validly elected as a manager of IDS and, if so, (2) would Rongen have assumed Shah's voting rights? For the following reasons, the answer to both questions is no.

### 1. Rongen Was Not Validly Elected as a Manager of IDS

The facts relevant to determining Rongen's status are straightforward and not in dispute. On July 6, 2018, Shah resigned as a manager of IDS (as well as IDT), creating a vacancy on the Board, which then consisted of three managers: Aigner,

---

[245] *See* JX 323.

[246] *See* JX 332 at 2.

[247] Pl.'s Opening Br. 52.

DiFalco, and Leduc.[248] On or about November 28, 2018, Aigner and Leduc signed a written consent of the Board purporting to elect Rongen as a manager of IDS "effective immediately" (the "Rongen Consent").[249] The Rongen Consent further stated that "the question whether Mr. Roelof Rongen as a Manager will have voting rights identical to Manish Shah will be resolved in" this action.[250] Whether Rongen was validly elected to the Board is a pure legal question that implicates several provisions in the IDS and IDT Agreements.

First, Section 5.12 of the IDS Agreement, which addresses Board vacancies, provides as follows:

> Any vacancy in the Board, including one created by an increase in the number of Managers, may be filled by (a) election at a meeting of the Members called for that purpose by the affirmative vote of the Members holding a majority of the aggregate number of outstanding Common Units at such time or (b) the affirmative vote of a majority of the remaining Managers (though less than a quorum of the Managers).[251]

Subsection (a) of this provision is irrelevant because Rongen's putative appointment was not implemented by a vote of IDS's members but instead was implemented by a vote of managers acting by written consent under subsection (b).

---

[248] PTO ¶ 22; JX 277.

[249] JX 332 at 8-10.

[250] *Id*. at 8.

[251] JX 44 § 5.12.

Second, Section 5.02(a) of the IDS Agreement states that "[p]rior to an IPO, the Board shall consist entirely of the individuals designated by the IDT Investors, acting together . . . , which initially shall be Stefan Aigner, Ray DiFalco, Manish Shah, and Gerard Leduc."[252] Section 5.11 contains a parallel provision. It states that the managers of IDS "may only be removed and replaced by the IDT Investors then holding Common Units."[253] Importantly, as of the date of the Rongen Consent, Section 5.4(w) of the *IDT Agreement* prohibited "any consent, vote, authorization ratification or approval by [IDT] with respect to its membership interest or rights in [IDS] related to or in connection with . . . the removal, replacement, or designation of [IDT's] managers in [IDS]" without "the written consent or affirmative vote of" both Aigner and DiFalco.[254]

Third, as discussed above, Sections 5.03 and 5.09 of the IDS Agreement contain Veto Rights that, subject to the conflict of interest provision in Section 5.14, permit Aigner and DiFalco to veto any action of the Board.

DiFalco argues that the interplay of these provisions renders the Rongen Consent invalid for two independent reasons. The court agrees for the reasons explained next.

---

[252] *Id.* § 5.02(a). The term "IDT Investors" means IDT and IDT Royalty, LLC. *Id.* at 5.
[253] *Id.* § 5.11.
[254] JX 39 § 5.4(w).

59

DiFalco's lead argument is that the Rongen Consent violated Section 5.02(a) of the IDS Agreement because IDT never designated Rongen to serve on the IDS Board and IDT could not do so because DiFalco's approval would have been necessary for IDT to take that action. Aigner does not dispute that Section 5.02(a) means that before an IPO of IDS, which has not occurred, the IDS Board must consist of individuals acceptable to IDT, the 72% owner of IDS. Nor does Aigner dispute that DiFalco had the authority under Section 5.4(w) of the IDT Agreement to veto Rongen as a designee to the IDS Board.

Aigner's only substantive response to the legal effect of Section 5.02(a) is that, "[t]o the extent Sections 5.02 and 5.12 conflict, settled rules of contract interpretation require that the court prefer specific provisions over more general ones."[255] Under Delaware law, "the specific provision ordinarily qualifies the meaning of the general one" only "where specific and general provisions conflict."[256] In this case, however, there is no conflict. Section 5.12(b) permits the

---

[255] Pl.'s Reply Br. 28 (internal quotation marks and alterations omitted). Aigner argues in the alternative that Sections 5.02(a) and 5.12 "can be harmonized" by reading Section 5.02(a) "to apply to removal and replacement [of] managers pursuant to Section 5.11 . . . but not necessarily to filling the vacancy of [a] manager that has resigned under Section 5.12." *Id.* at 29. As noted above, Section 5.11 provides that "[a]ny Manager may resign at any time" and that prior to an IPO, "the Managers may only be removed and replaced by the IDT Investors then holding Common Units." JX 44 § 5.11. Aigner offers no logical reason why Section 5.02(a) should be applied differently depending on how the vacancy was created (*i.e.*, resignation versus removal) and the court sees none.

[256] *DCV Hldgs., Inc. v. ConAgra, Inc.*, 889 A.2d 954, 961 (Del. 2005) ("Specific language in a contract controls over general language, *and where specific and general provisions*

remaining managers to fill a vacancy on the Board notwithstanding the potential lack of a quorum (subject to Aigner and DiFalco's Veto Rights, as discussed next) while Section 5.02(a) is a qualification provision that limits the pool of potential candidates before an IPO to individuals acceptable to IDT. Consistent with foundational principles of contract interpretation, this construction harmonizes and gives meaning to both provisions at issue, obviating any need to prefer one over the other.[257]

DiFalco next argues that the Rongen Consent violated his Veto Rights in Sections 5.03 and 5.09, which require DiFalco's approval for any action of the Board. Section 5.03 states, in relevant part, that

> [a]ction of the Board shall be authorized by the vote of a majority of the Managers present at the time of the vote if there is a quorum, *unless otherwise provided by this Agreement*; provided, however, that such majority shall include the affirmative vote of (i) Stefan Aigner and (ii) at least one of Ray DiFalco or Manish Shah.[258]

---

*conflict*, the specific provision ordinarily qualifies the meaning of the general one.") (emphasis added) (affirming trial court's holding that specific-over-the-general rule applied where the two relevant provisions conflicted such that the application of one "would render [the other] meaningless"); *see also Sonitrol Hldg. Co. v. Marceau Investissements*, 607 A.2d 1177, 1184 (Del. 1992) (stating that "where there is an inconsistency between general provisions and specific provisions, the specific provisions ordinarily qualify the meaning of the general provisions") (quoting *Stasch v. Underwater Works, Inc.*, 158 A.2d 809, 812 (Del. Super. Ct. 1960)); *Katell v. Morgan Stanley Gp., Inc.*, 1993 WL 205033, at *4 (Del. Ch. June 8, 1993) (same); *Restatement (First) of Contracts* § 236(c) ("*Where there is an inconsistency between general provisions and specific provisions*, the specific provisions ordinarily qualify the meaning of the general provisions.") (emphasis added).

[257] *See Sunline*, 2019 WL 1068183, at *8 ("The contract must also be read as a whole, giving meaning to each term and avoiding an interpretation that would render any term 'mere surplusage.'").

[258] JX 44 § 5.03.

Focusing on the phrase italicized above, Aigner counters that "Section 5.12 'otherwise provides' an alternative voting mechanism that differs from the voting mechanism set forth in Section 5.03."[259] This argument misconstrues the use of the phrase "otherwise provided" in Section 5.03. That phrase plainly modifies the immediately preceding text that requires as a default rule a quorum to take Board action at a meeting.

The fallacy in Aigner's argument also is borne out by the fact that the phrase "otherwise provided" does not even appear in Section 5.09, which applies the same Veto Rights to action taken by written consent. No logical reason has been advanced why Section 5.12 would provide an "alternative voting mechanism" for a Board action taken at a meeting as opposed to (and as was attempted here with the Rongen Consent) a Board action taken by written consent.

"When interpreting a contract," Delaware courts "will give priority to the parties' intentions as reflected in the four corners of the agreement, construing the agreement as a whole and giving effect to all its provisions."[260] Here, Sections 5.03, 5.09, and 5.12 are easily harmonized. Sections 5.03 and 5.09 afford specific individuals special Veto Rights for *any* Board action while Section 5.12 simply

---

[259] Pl.'s Opening Br. 53.

[260] *Salamone v. Gorman*, 106 A.3d 354, 368 (Del. 2014) (internal quotation marks omitted).

provides that for one particular Board action—filling a vacancy in the Board—the Board "may" act by the "affirmative vote of a majority of the remaining Managers" even in the absence of a quorum without disturbing the Veto Rights. Given that all three provisions are given effect through this construction without curtailing the unbounded nature of the Veto Rights, and given the absence of any reference whatsoever to the Veto Rights in Section 5.12, it would be unreasonable in my opinion to read into Section 5.12 a *sub silentio* exception to the Veto Rights expressly set forth in Sections 5.03 and 5.09.

### 2. Rongen Would Not Have Assumed Shah's Voting Rights Even if He Had Been Validly Appointed as a Manager

Having concluded that Rongen was not validly elected as a manager of IDS, it is not necessary to decide whether he would have assumed Shah's voting rights had he been validly elected. In the interest of providing the litigants additional guidance to assess their options going forward, however, the court will reach this issue.

In my opinion, Rongen would not have assumed Shah's voting rights even if he had been validly appointed to the Board. Sections 5.03 and 5.09 confer the Veto Rights on Aigner, DiFalco, and Shah *by name* without stating or suggesting that those rights could be assumed by their successors as managers.[261] It is entirely

---

[261] *See* JX 44 §§ 5.03, 5.09.

logical that these rights were intended to be personal to these specific individuals given their status as the founders of the business. Indeed, the IDS Agreement distinguishes between the "Managers" as a whole and the three founders. Section 5.02 of the IDS Agreement provides that the IDS Board "initially" shall consist of four managers and adds as the fourth manager a person (Leduc) who—unlike Aigner, DiFalco, and Shah—was not a founder and does not have Veto Rights. The provision of Veto Rights to Aigner, DiFalco, and Shah by name in Sections 5.03 and 5.09, while not providing such rights to Leduc or to the founders' successors as managers elsewhere in the IDS Agreement, demonstrates that new managers of IDS were not intended to share in the special rights assigned to the founders personally.

Aigner cites no language in the IDS Agreement suggesting that the Veto Rights conferred on the founders by name were intended to pass on to their replacements. Given that it was foreseeable when the IDS Agreement was signed that managers could resign, die, or become incapacitated, it would have been easy for the drafters to include such language, but they did not. Bereft of any textual support for his position, Aigner resorts to arguing that he "bargained for" a voting structure that left him "an option" not to have to deal solely with DiFalco because he "viewed Shah as more reasonable."[262] Aigner's subjective views about what he

---

[262] Pl.'s Opening Br. 54-55; Pl.'s Reply Br. 31. Relying on the text of the IDT Agreement, Aigner also argues that "the way the IDS Agreement abandons the 'Founder Member' concept and declines to give DiFalco and Shah the right to approve the replacement of the

believes he did or did not bargain for, however, are not relevant to interpreting the text of the IDS Agreement under Delaware's objective theory of contracts.[263]

Finally, Aigner argues that holding that the Veto Rights pass to Shah's replacement is "necessary to allow the Board to function."[264] This misses the point. By creating Veto Rights and assigning them to named individuals, the parties created the possibility that the Board might deadlock and cease to function if those individuals cannot agree on important decisions. The "policy" of the Delaware Limited Liability Company Act is "to give the maximum effect to the principle of freedom of contract."[265] Unfortunately, as this case shows, that freedom allows parties to adopt contractual arrangements that do not work, particularly when the principals do not trust each other and do not get along.

---

other managers of IDS" is probative of "what each party 'bargained for.'" Pl.'s Reply Br. 31. Apart from the fact that I have concluded that the Veto Rights do apply to the filling of a Board vacancy, as discussed above, this extrinsic evidence is irrelevant because I do not find the IDS Agreement to be ambiguous with respect to the personal nature of the Veto Rights. *See Eagle Indus.*, 702 A.2d at 1232 ("If a contract is unambiguous, extrinsic evidence may not be used to interpret the intent of the parties, to vary the terms of the contract or to create an ambiguity.").

[263] *See, e.g.*, *Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1159 (Del. 2010) ("Delaware adheres to the 'objective' theory of contracts, i.e. a contract's construction should be that which would be understood by an *objective, reasonable third party*.") (internal quotation marks omitted and emphasis added).

[264] Pl.'s Opening Br. 55; *see* Pl.'s Reply Br. 31.

[265] 6 *Del. C.* § 18-1101(b).

## C. Judicial Dissolution Is Warranted in This Case Because It Is Not Reasonably Practicable to Carry on the Business of IDS in Conformity with the IDS Agreement

The court next addresses DiFalco's counterclaim for dissolution. The Delaware LLC Act provides that "[o]n application by or for a member or manager the Court of Chancery may decree dissolution of a limited liability company whenever it is not reasonably practicable to carry on the business in conformity with a limited liability company agreement."[266] The IDS Agreement expressly incorporates this provision. It states that IDS "shall be dissolved and its affairs wound up upon . . . the entry of a decree of judicial dissolution with respect to the Company under Section 18-802 of the Delaware Act."[267] DiFalco is a manager of IDS and in that capacity has advanced a claim for dissolution.[268] Thus, the only question before the court is whether it is "reasonably practicable" for IDS "to carry on [its] business" in conformity with the IDS Agreement.

"The 'not reasonably practicable' standard does not require a petitioner to show that the purpose of the limited liability company has been completely frustrated."[269] "The text of § 18-802 does not specify what a court must consider in

---

[266] 6 *Del. C*. § 18-802.

[267] JX 44 § 10.02(c).

[268] PTO ¶ 21; Dkt. 17 ¶ 184.

[269] *In re: GR BURGR, LLC*, 2017 WL 3669511, at *5 (Del. Ch. Aug. 25, 2017) (internal quotation marks omitted).

evaluating the 'reasonably practicable' standard, but several convincing factual scenarios have pervaded the case law: (1) the members' vote is deadlocked at the Board level; (2) the operating agreement gives no means of navigating around the deadlock; and (3) due to the financial condition of the company, there is effectively no business to operate."[270] None of these factors is "individually dispositive; nor must they all exist for a court to find it no longer reasonably practicable for a business to continue operating."[271]

With respect to deadlock, "when an LLC agreement requires that there be agreement between two managers for business decisions to be made, those two managers are deadlocked over serious issues, and the LLC agreement provides no alternative basis for resolving the deadlock, it is not reasonably practicable to continue to carry on the LLC business in conformity with [its] limited liability company agreement."[272] Ultimately, if the "deadlock cannot be remedied through a legal mechanism set forth within the four corners of the operating agreement, dissolution becomes the only remedy available as a matter of law."[273]

---

[270] *Fisk Ventures, LLC v. Segal*, 2009 WL 73957, at *4 (Del. Ch. Jan. 13, 2009) (Chandler, C.).

[271] *Id.*

[272] *Vila v. BVWebTies LLC*, 2010 WL 3866098, at *7 (Del. Ch. Oct. 1, 2010) (internal quotation marks omitted and emphasis removed) (Strine, V.C.).

[273] *Fisk Ventures*, 2009 WL 73957, at *7.

The court will analyze whether it is reasonably practicable for IDS to carry on its business in accordance with the IDS Agreement in two parts: first, by examining whether the Board is deadlocked over important issues, and second, by examining whether the IDS Agreement provides a mechanism for resolving the deadlock.[274] These issues are addressed in turn below.

### 1. The IDS Board Is Deadlocked on Numerous Important Issues

As explained in detail above, the relationship between Aigner, on the one hand, and DiFalco and Shah, on the other hand, has been turbulent and defined by distrust and animosity for at least two years. An early episode occurred in May 2017, when Aigner reneged on implementing the Infrastructure Resolution, which was intended to put to rest any controversy over the Orangeburg Facility as part of a "package deal" of resolutions. As explained previously, Aigner took this action while implementing other resolutions in the package beneficial to him in order to preserve his ability to threaten litigation over the Orangeburg Facility as leverage over DiFalco and Shah.

In July 2017, tensions increased when DiFalco learned from Trygg's CEO (Kramer) that Aigner secretly was exploring using Galephar as a CMO. After DiFalco found out, Aigner sought to remove Kramer as a Board observer in advance

---

[274] *See, e.g.*, *Vila*, 2010 WL 3866098, at *6-8 (analyzing deadlock, then whether the agreement contained a solution); *Fisk Ventures*, 2009 WL 73957, at *4-5 (same).

of an acrimonious Board meeting held later that month, during which Aigner confessed to Kramer his plan "to starve" DiFalco and Shah to make them "behave" when Kramer questioned Aigner's refusal to compromise with DiFalco and Shah.[275]

Over the following months, Aigner obtained Touam's approval of the August 2017 Consents and the Zuckerman Resolution hurriedly before DiFalco or Shah could have any say on those matters. When these tactics did not achieve their intended result, Aigner tried to outflank DiFalco by appealing to Shah, DiFalco's longtime friend and business partner, to take Aigner's side. These efforts became confrontational and led to Shah's resignation in July 2018 as a manager of the Company he co-founded—an act of apparent frustration and desperation in dealing with Aigner. Aigner then filed suit and, while this litigation was pending, attempted to install Rongen as a manager, to resurrect Touam as an Independent Representative, and to have Touam sign a resolution without any advance notice to DiFalco to conditionally approve a product development agreement with Galephar.

Underlying the rupture in their relationship, Aigner, DiFalco, and Shah have been at loggerheads over issues of fundamental importance to the Company and its future. Three examples of significant deadlocks between the two sides follow.[276]

---

[275] Tr. 842 (Kramer).

[276] In the context of a dissolution claim, "deadlock" means disagreement and discord between the parties. *See Vila*, 2010 WL 3866098, at *7 (citing as evidence of "deadlock" the fact that the managers "are unable to agree" on several important issues); *Fisk Ventures*, 2009 WL 73957, at *4 (discussing the parties' "long history of disagreement and discord"

First, Aigner and DiFalco fundamentally disagree over who IDS should partner with to develop new products. This is perhaps the most pressing issue facing the Company. Aigner believes that Galephar would be a suitable development partner and enlisted Touam's assistance just weeks before trial to approve a new agreement with Galephar for it to provide development and tech transfer services to IDS for two new products.[277] On the other hand, DiFalco and Shah have articulated ostensibly legitimate concerns about using Galephar (both as a CMO and as a development partner), namely Galephar's: (i) location in Puerto Rico, which poses logistical issues; (ii) lack of understanding of aspects of the manufacturing process for IDS's products and deficiencies in its equipment; (iii) willingness to sell its facility to IDS, which DiFalco perceives to be Galephar's real agenda; (iv) unwillingness to include a non-compete provision in an agreement with IDS; and (v) failure to successfully manufacture RoxyBond.[278] DiFalco also is understandably

---

in analyzing whether "deadlock" exists); *see also Meyer Nat. Foods LLC v. Duff*, 2015 WL 3746283, at *3 (Del. Ch. June 4, 2015) ("Deadlock refers to the inability to make decisions . . . .").

[277] JX 332 at 1, 3; *see* JX 258 at 54, 59. As noted above, the resolution purporting to approve the agreement with Galephar was expressly made conditional on the court determining that Touam validly rescinded his resignation as Independent Representative. JX 332 at 2.

[278] Tr. 727-35, 775-78 (DiFalco). Kramer also expressed serious concerns about partnering with Galephar due to the extreme damage inflicted on Puerto Rico by Hurricane Maria in September 2017. JX 170; *see* JX 169.

concerned about Aigner's secrecy regarding his communications with Galephar.[279]

Second, Aigner and DiFalco disagree about which CMO to recommend to Daiichi. From Aigner's perspective, Galephar is an attractive option for a CMO because it: (i) has experience with a unique ingredient used in IDS's products; (ii) represented that it could complete a tech transfer for RoxyBond without any assistance from Cerovene; and (iii) indicated that it was willing to sell its manufacturing facility to IDS "down the road."[280] DiFalco, on the other hand, has opposed Galephar as a CMO for the reasons explained above. The second Complete Response letter received after trial from the FDA raises additional questions about Galephar's suitability to manufacture RoxyBond, consistent with DiFalco's concerns. The disagreement is consequential because of its obvious importance to the commercial success of IDS's only two FDA-approved products.

Aigner asserts that "there is no current disagreement as to CMOs" because "the Board approved Patheon, Galephar and Catalent."[281] That assertion is misleading. Under the Daiichi Agreement, Daiichi is "responsible for making all material decisions with respect to the transfer of MorphaBond and RoxyBond manufacturing to" another CMO if Patheon is unable to act as the CMO, and to do

---

[279] *See* Tr. 726 (DiFalco).

[280] Tr. 102-03 (Aigner).

[281] Pl.'s Opening Br. 56 n.20.

71

so "in consultation with" IDS.[282]  Patheon has never successfully manufactured either product.[283]  Currently, only MorphaBond is being manufactured, and only by Cerovene, which does not have the capacity of CMOs like Patheon or Catalent.[284] Thus, the question of which CMO to recommend to Daiichi remains open for both products—that is, which CMO to recommend for RoxyBond to commence commercial manufacturing of that product, and which to recommend for MorphaBond for any additional capacity needed beyond what Cerovene can provide.

Third, Aigner and DiFalco disagree over the strategic vision for the Company, in particular whether IDS should expend resources to employ its own sales representatives to market its products.  Aigner envisions IDS as an integrated pharmaceutical company with its own in-house sales force, which he thinks will deliver better margins than hiring an outside firm.[285]  DiFalco has opposed developing an in-house sales force because he believes that is not the Company's "sweet spot" and that IDS's priority should be drug development.[286]  The sales force

---

[282] JX 51 § 6.8(c).

[283] Tr. 611, 614-15 (Shah).

[284] Tr. 549, 599-600 (Shah).

[285] Tr. 18 (Aigner).

[286] Tr. 764 (DiFalco); JX 187 at 1 (stating in an email to Aigner and others regarding the sales force issue that "the ability to rely upon a seasoned [Daiichi] sales force that [Daiichi] will train and provide all of the necessary experience and information seems vastly preferable to me").

issue not only has long term consequences, but directly impacts the current financial condition of the Company. In the first half of 2018, IDS spent about as much on sales and marketing as it did on manufacturing and research and development combined as the Company aggressively hired sales representatives at Aigner's direction.[287]

Aigner contends that the disagreement regarding the sales force is a "trumped-up fiction" and a "red herring" because the Daiichi Agreement "requires [IDS] to retain a sales force" and because "DiFalco never presented the issue to the Board for a vote and, if he did, he would be in the minority."[288] The court disagrees. As to the first contention, the Daiichi Agreement does require IDS to "co-promote" the products "using a coordinated sales force of" sales representatives, but the representatives may be "employed directly by" IDS or hired "through Third Parties," which are defined as "any legal person, entity or organization other than" IDS, Daiichi, or their affiliates.[289]

As to the second contention, Aigner has it backwards. The problem is not that DiFalco would not get his way if he sought Board approval to fire employees. The

---

[287] JX 292 at 7 (noting that "44 IDS Specialty Sales Representatives" had been hired and trained "since March 2018 thru June/July" of 2018), 31 (showing expenses of $2,477,134 for sales and marketing and $2,535,134 for manufacturing and research and development).

[288] Pl.'s Opening Br. 57-59.

[289] JX 51 §§ 1.16, 1.68, 7.1. The agreement also gives IDS the right to opt out of the co-promotion obligation altogether upon 180 days' written notice to Daiichi. *Id.* § 7.2(c).

problem is that Aigner did not obtain DiFalco's approval to make the strategic decision to hire a sales force in the first place. To be more specific, there is no indication in the record that the Board ever affirmatively approved hiring a sales force, a proposal DiFalco would have been within his rights to block using his Veto Rights, or that Aigner ever obtained DiFalco's consent under Section 5.15 to hire a sales force acting in his capacity as CEO.[290]

\* \* \* \* \*

In sum, the current state of play at the Company is that the Board consists of three managers (Aigner, DiFalco, and Leduc), two of whom (Aigner and DiFalco) disagree vehemently on issues critical to the Company's management and business strategy. Those same two individuals have Veto Rights that apply by default to any action of the Board and consent rights that apply to officer-level decisions. If that were the end of the analysis, dissolution of the Company would be a foregone conclusion.[291] Thus, the only question that remains is whether the conflicts of

---

[290] Citing an October 2017 email exchange (JX 187), Aigner contends that "DiFalco ultimately never objected to an internal salesforce." Pl.'s Reply Br. 36. To repeat, Section 5.15 provides that the CEO shall "in general supervise and control the business and affairs of the corporation *subject to the advice and consent of the President*." JX 44 § 5.15. Fairly read, the October 2017 email exchange reflects a discussion of alternatives and cannot legitimately be construed as unqualified consent by DiFalco to employ an internal sales force.

[291] *See, e.g.*, *Vila*, 2010 WL 3866098, at \*1 (granting dissolution of LLC because of deadlock between two owners who controlled equal 49% stakes with the remaining 2% held by a trust that took no position in the dispute); *Haley v. Talcott*, 864 A.2d 86, 89 (Del.

74

interest provision in Section 5.14 provides a viable mechanism to make it reasonably practicable to carry on the business of the Company. That issue is addressed next.

### 2. Section 5.14(b) Does Not Provide a Workable Mechanism to Resolve the Deadlock

As with all things in this case, Aigner and DiFalco sharply disagree over the meaning of Section 5.14(b) and whether it provides a workable mechanism to resolve the parties' fundamental disagreements concerning the management of IDS and its business strategy. Aigner contends that the provision can work and that the Company's current dysfunction will be resolved if the court grants his request for a categorical declaration that Section 5.14(b) bars DiFalco from using his Veto Rights on the selection of CMOs or development partners. DiFalco contends that the provision does not work and that Aigner has misused the provision as a weapon to marginalize DiFalco's role in managing the Company. For the reasons explained next, the court concludes that Section 5.14(b) does not provide a workable mechanism to resolve the deadlock between Aigner and DiFalco so as to make it reasonably practicable to carry on the business of IDS in conformity with the IDS Agreement.

---

Ch. 2004) (Strine, V.C.) (granting dissolution of LLC because petitioner "demonstrated an indisputable deadlock between the two 50% members of the LLC").

Section 5.14(b) states, in relevant part, that IDS "shall not take any action pertaining to the rights and obligations of [IDS] relating to an Affiliate Transaction, other than in accordance with the paragraphs below:"

>  (i) Any Manager with a conflict of interest concerning an Affiliate Transaction (an "Interested Manager") shall disclose the conflict of interest to the Board and shall describe all material facts concerning the Affiliate Transaction and the conflict of interest that are known to the Interested Manager.

>  (ii) In case Stefan Aigner is the Interested Manager, the voting, consent or similar rights as a member of the Board with respect to any Affiliate Transaction shall be exercised by Kip Martin, as an independent party (an "Independent Representative"), whether at a meeting of the Board or by written consent. In case Ray DiFalco or Manish Shah is the Interested Manager, the voting, consent or similar rights as a member of the Board with respect to any Affiliate Transaction shall be exercised by Hafid Touam, as an Independent Representative, whether at a meeting of the Board or by written consent. In the event Kip Martin or Hafid Touam is unwilling or unable to serve as an Independent Representative, the Board shall appoint a replacement Independent Representative.[292]

Subsection (b)(i) is referred to, at times, as the "Disclosure Requirement." The term "Affiliate Transaction" is defined in Section 5.14(b) broadly to encompass not only *actual* arrangements involving a manager, but transactions that "could impact" an arrangement involving a manager:

>  An "Affiliate Transaction" shall mean: (i) an arrangement for goods, services or space by and between the Company and a Manager or any Affiliate of a Manager, (ii) a Company transaction which *could impact*

---

[292] JX 44 § 5.14(b).

an arrangement with an Affiliate in which a Manager has a direct or indirect personal or financial interest, (iii) any business dealing, undertaking, contract, agreement, lease or other arrangement where a Manager has a conflict of interest, including any arrangement for goods, services or space, or (iv) a transaction that *could impact* other Affiliate Transactions which the Company entered into or is contemplating entering into.[293]

As an initial matter, because of Touam's resignation, no Independent Representative is currently in place to vote for DiFalco on matters to which Section 5.14(b) might apply. Board action would be required to name a replacement, and there is every reason to believe that Aigner and DiFalco would deadlock on this decision as well. Indeed, all of their efforts to date to appoint a new Independent Representative to replace Touam have failed. For this reason alone, Section 5.14(b) fails to provide a workable mechanism to break the deadlock between Aigner and DiFalco. But even if a new Independent Representative for DiFalco were in place— for example, if the court were to appoint one—Section 5.14(b) would fail to provide a workable solution to the deadlock in my opinion.

Trial of this action exposed two aspects of Section 5.14(b) that appear to be the root cause of the problems with its application. First, Section 5.14(b) does not specifically address *who decides* when the Independent Representative must step in

---

[293] *Id*. (emphasis added). The term "Affiliate" is defined as "any other Person that, directly or indirectly, Controls, is under common Control with or is Controlled by such Person." *Id*. § 1.01. "Person" means both individuals and business entities and "Control" is "the power to direct or cause the direction of the management and policies of such Person." *Id*.

to vote for an Interested Manager. Second, the *scope of the provision* is inherently vague and ambiguous. These two issues are addressed, in turn, below.

On the first issue, DiFalco contends that "Section 5.14(b) is not an automatic recusal provision . . . but rather a procedural safeguard designed to protect a conflicted Manager from potential liability for duty of loyalty breaches."[294] According to DiFalco, the provision is not triggered unless a manager steps forward to acknowledge that he has a "conflict of interest concerning an Affiliate Transaction."[295] Put differently, DiFalco argues that satisfaction of the Disclosure Requirement in subsection (b)(i) is a precondition to the ability of an Independent Representative to vote under subsection (b)(ii).

For his part, Aigner observes that "the term 'Interested Manager' is defined as a Manager with a conflict of interest concerning an Affiliate Transaction, not a Manager with a conflict *who also discloses his interest* in the transaction."[296] Aigner thus argues that "determining whether a Manager is an Interested Manager is an objective standard, not dependent on whether the Manager discloses that interest."[297] And, although he does not say so explicitly, Aigner's past conduct demonstrates that he believes that if he determines in his own mind that DiFalco is an Interested

---

[294] Def.'s Opening Br. 56 (Dkt. 122).

[295] JX 44 § 5.14(b)(i).

[296] Pl.'s Opening Br. 44 (emphasis in original).

[297] *Id*. at 44-45.

Manager with respect to some matter, he may immediately proceed to invoke the Independent Representative provision unilaterally.

In my opinion, DiFalco's interpretation accords with the text and structure of Section 5.14(b) and provides the only reasonable interpretation on the "who decides" question. I begin with the text. Section 5.14(b) states, in the sentence immediately preceding subsections (b)(i) and (b)(ii), that the "Company shall not take any action pertaining to the rights and obligations of the Company relating to an Affiliate Transaction, *other than in accordance with the paragraphs below*."[298] This sentence indicates that the Company cannot take any action regarding an Affiliate Transaction unless *both* subsections (b)(i) and (b)(ii) are followed. In other words, the plain language of Section 5.14(b) supports the conclusion that disclosure by the Interested Manager—which is the only obligation set forth in subsection (b)(i)—is required in order to utilize the Independent Representative to vote on a Board matter under subsection (b)(ii).

The structure of Section 5.14(b) confirms this interpretation. The Disclosure Requirement in subsection (b)(i) appears before the Independent Representative provision in subsection (b)(ii), and logically should be satisfied before the Independent Representative provision is triggered. This sequence makes sense

---

[298] JX 44 § 5.14(b) (emphasis added).

because the other Board members would need to know about the facts and circumstances concerning a conflict of interest before they would know to use the Independent Representative provision. It also serves the salutary purpose of permitting the Independent Representative (and other Board members) to consider the Interested Manager's disclosure of "all material facts concerning the Affiliate Transaction and the conflict of interest that are known to the Interested Manager" in order to vote in a fully informed manner.[299]

The fundamental problem with Aigner's interpretation is that, by letting any manager unilaterally invoke the Independent Representative provision in subsection (b)(ii), it reads the Disclosure Requirement out of Section 5.14(b). Thus, as a textual matter, Aigner's interpretation is unreasonable because it violates the basic principle that "a contract should be interpreted in such a way as to not render any of its provisions illusory or meaningless."[300] Furthermore, as a practical matter, Aigner's interpretation is problematic because it provides opportunities for mischief by permitting someone to circumvent the Veto Rights set forth in Sections 5.03 and 5.09 of the IDS Agreement.

Consider, for example, when Aigner took it upon himself in August 2017 to obtain Touam's signature on a written consent to effectively allow Aigner to

---

[299] *Id.* § 5.14(b)(i).

[300] *Sonitrol*, 607 A.2d at 1183.

"exclude" DiFalco and Shah "from communications relating to Affiliate Transactions" as an apparent act of retaliation after DiFalco asked due diligence questions about using Galephar as a CMO for RoxyBond.[301] By invoking Section 5.14(b) unilaterally, Aigner circumvented DiFalco's Veto Rights in an effort to rewrite his contractual informational rights as a manager and President of IDS and to curtail his common law informational rights as a fiduciary of the Company.[302] The court can discern no justification for this action.

On the other side of the ledger, an obvious challenge to applying Section 5.14(b) under DiFalco's interpretation is that its utility depends on the good faith of the manager to identify a conflict of interest. If one manager believes another manager failed to make a required disclosure, judicial relief is available to provide a remedy,[303] although it is not difficult to imagine scenarios where the Company's

---

[301] JX 129 at 2, 4.

[302] The IDS Agreement provides that the "Managers shall have fiduciary duties of loyalty and care similar to that of directors of business corporations organized under the Delaware General Corporation Law." JX 44 § 5.14(a). Under Delaware law, a "director's right to information is essentially unfettered in nature" and presumptively includes "equal access to board information." *Kalisman v. Friedman*, 2013 WL 1668205, at *3 (Del. Ch. Apr. 17, 2013) (internal quotation marks omitted); *Moore Bus. Forms, Inc. v. Cordant Hldgs. Corp.*, 1996 WL 307444, at *5 (Del. Ch. June 4, 1996) (internal quotation marks omitted).

[303] Aigner cites *Mobile Communications Corp. of America v. MCI Communications Corp.*, 1985 WL 11574, at *4 (Del. Ch. Aug. 27, 1985), which holds that "[t]he 'prevention doctrine' provides that a party may not escape contractual liability by reliance upon the failure of a condition precedent where the party wrongfully prevented performance of that condition precedent." Consistent with this holding, DiFalco and Shah expressly acknowledge that they could face liability for failing to make a disclosure required under Section 5.14(b)(i). *See* Def.'s Opening Br. 60 n.213; Def.'s Reply Br. 26-27.

governance could become paralyzed if that were its only recourse. That said, the presumption that managers will act in good faith in complying with their obligations in Section 5.14(b) is supported by the plain text and structure of the provision, and Aigner has not identified a single occasion when DiFalco or Shah failed to make a disclosure he believes should have been made under Section 5.14(b)(i) of the IDS Agreement since that agreement became effective.[304]

When pressed at post-trial argument on the source of Aigner's putative authority to decide when the Independent Representative should vote, his counsel advanced a brand new argument that Touam is the one who gets to decide.[305] There are many problems with that suggestion, including that (i) no text in the IDS Agreement supports this interpretation, (ii) there is no indication in the record that this is how Section 5.14(b) actually has been implemented, (iii) having the Independent Representative decide when to vote does not negate the Disclosure Requirement in subsection (b)(i), and (iv) having the Independent Representative decide without the benefit of the disclosure from a putatively Interested Manager would be a recipe for uninformed decision-making.[306]

---

[304] Aigner takes issue with DiFalco's failure to disclose "various related-party transactions in connection with the Orangeburg Facility build-out." Pl.'s Reply Br. 17. That conduct, however, predated implementation of the IDS Agreement.

[305] Post-Trial Tr. 49.

[306] In support of the "Touam should decide" argument, Aigner's counsel pointed to an unsigned draft of a joint written consent of the members and managers of IDT Royalty, LLC from August 2016 that apparently was acceptable to DiFalco and Shah. Post-Trial

In short, of the two interpretations of Section 5.14(b) the parties have proffered on the question of who decides when the Independent Representative provision is triggered, DiFalco's interpretation is the only textually reasonable one. This conclusion has an important consequence, which is that the Independent Representative provision cannot be applied—and thus DiFalco's Veto Rights remain intact—unless and until DiFalco discloses to the Board that he has "a conflict of interest concerning an Affiliate Transaction."[307] Because that process was not followed when Aigner unilaterally obtained signatures for the Zuckerman Resolution, that action was invalid.[308]

The second interpretative issue with Section 5.14(b) concerns the scope of the provision. Subsection (b)(i) defines an "Interested Manager" as a manager "with a conflict of interest concerning an Affiliate Transaction."[309] The term "conflict of interest" is not defined in Section 5.14(b) or anywhere else in the IDS Agreement.

---

Tr. 78-81. It states, with respect to supply chain issues, that "[s]hould Hafid Touam determine in his sole judgment that the Founding Members [*i.e.*, DiFalco and Shah] do not appear to be acting in good faith towards [IDT Royalty, LLC], the Founding Members shall recuse themselves from a vote and Hafid Touam shall cast their votes." JX 28 at 4. This language never made its way into the IDS Agreement and thus is irrelevant.

[307] JX 44 § 5.14(b)(i).

[308] *See supra* Section I.N. The Zuckerman Resolution is invalid for the independent reason that DiFalco was not provided notice of the proposed action at least two business days before the written consent was signed. *See* JX 44 § 5.09 (requiring that notice of a proposed action by written consent be "delivered to each Manager and Observer at least two (2) Business Days prior to such action").

[309] *Id.* § 5.14(b)(i).

As discussed previously, Section 5.14(b) defines the term "Affiliate Transaction" in four subparts, two of which appear to encompass *potential* conflicts of interest, *i.e.*, those that "could impact" certain arrangements or other transactions.[310]

Focusing on the definition of "Interested Manager," Aigner contends that the phrase "conflict of interest concerning an Affiliate Transaction" simply means that the manager "has an interest in the Affiliate Transaction."[311] But this construction gives no independent meaning to the term "conflict of interest" as used in that definition. One way to give the term "conflict of interest" independent meaning for purposes of defining what constitutes an "Interested Manager" is to construe the term to apply only to "actual" conflicts of interest.

The distinction between "actual" and "potential" conflicts of interest is important under Delaware law. It has been used to demarcate when a fiduciary wearing two hats can be liable for acting disloyally.[312] Relatedly, in the context of interested director transactions, only "sufficiently *material*" interests can rebut the business judgment rule presumption, the determination of which is a "fact-dominated question."[313] Notably, one of the four subparts of the definition of

---

[310] *Id.* § 5.14(b).

[311] Post-Trial Tr. 66-67.

[312] *See Cooke v. Oolie*, 2000 WL 710199, at *12-13 (Del. Ch. May 24, 2000) (Chandler, C.) (holding that plaintiffs failed to rebut presumption of business judgment rule where they had only identified "a potential conflict of interest" as opposed to "an actual conflict").

[313] *Cede & Co. v. Technicolor, Inc.*, 634 A.2d 345, 364 (Del. 1993).

"Affiliate Transaction" refers to "where a Manager *has* a conflict of interest," suggesting that this narrower meaning of the term may have been intended for purposes of Section 5.14(b).[314] The court, however, cannot discern from the four corners of the contract whether this meaning was intended or whether "conflict of interest" was intended to mean any *potential* conflict of interest. In other words, the definition of the term "Interested Manager" is facially ambiguous.

The drafting history of Section 5.14(b) shows that Aigner sought to broaden the provision to cover *potential* conflicts of interest by adding the phrase "could impact" in various drafts, but it is unclear whether the ultimate provision reflects a shared intention on that point. As the drafting history shows, it was suggested at one point that the term "conflict of interest" be defined to include the "could impact" language, but that definition ultimately was dropped and the undefined term was used instead to qualify the term "Affiliate Transaction" when defining the term "Interested Manager":

- The first draft of Section 5.14(b) defined "Conflict of Interest" as when a manager "has a direct or indirect personal or financial interest in a transaction or other matter involving the Company," and defined "Affiliate Transaction" simply as "any arrangement for goods, services or space by and between the Company and a Manager or any Affiliate of a Manager."[315] It omitted the "could impact" language altogether.

---

[314] JX 44 § 5.14(b).

[315] JX 17 at 1.

85

- The second iteration, which appears to have come from the Aigner side of the table, formally defined the term "Conflict of Interest," providing that one exists with respect to a transaction if the "transaction *could impact* other agreements the company might have entered into or is contemplating entering . . . which is an Affiliate Transaction."[316]

- The third iteration dropped the formal definition of "Conflict of Interest," using the undefined term "conflict of interest" instead, but it introduced the "could impact" language in two parts of an expanded, four-part definition of Affiliate Transaction and defined an "Interested Manager" as simply a manager "with a conflict of interest."[317]

- The fourth iteration, which became the operative version of Section 5.14(b), changed the definition of Interested Manager to a manager "with a conflict of interest concerning an Affiliate Transaction."[318]

In sum, the court cannot discern from the plain language of Section 5.14(b) or its drafting history whether the shared intention of the parties was that a manager would be an "Interested Manager" only if he had an *actual* conflict of interest or if he had either an *actual* or *potential* conflict of interest. Equally problematic, the court cannot discern what the outer boundary of the latter concept would be even if that was the shared intention given the inherent vagueness of the term "could impact."

---

[316] JX 29 (emphasis added).

[317] JX 30 at 1.

[318] JX 36 at 1, 28-29.

The bottom line is that the scope of Section 5.14(b) is inherently vague and ambiguous.

What is clear from the record in this case is that the ambiguity and vagueness inherent in the scope of Section 5.14(b), combined with the fact that the provision is silent on who decides when the Independent Representative provision is triggered, has allowed Aigner to use Section 5.14(b) improperly to circumvent DiFalco's Veto Rights and to marginalize his managerial role in the Company. Consider the parties' dispute over the selection of a CMO for RoxyBond.

DiFalco testified credibly that "Cerovene is not involved in making RoxyBond," "we never said we were going to make it," and "[w]e don't want to make it."[319] Cerovene also does not have the capacity or equipment to make RoxyBond.[320] Despite these facts, Aigner has excluded DiFalco from any decision-making role in the selection of a CMO for RoxyBond and asks the court for a categorical, forward-looking declaration that Section 5.14(b) bars DiFalco from using his Veto Rights on the selection of any CMOs as well as development partners. In essence, Aigner's position appears to be that, so long as DiFalco owns an interest

---

[319] Tr. 752-53 (DiFalco).

[320] Tr. 549 (Shah) (explaining that Cerovene's current production capacity is limited to making "small batches" of MorphaBond); Tr. 735-36 (DiFalco) (explaining that "coating equipment . . . integral to the production of RoxyBond and MorphaBond" was removed from the Orangeburg Facility).

87

in Cerovene and it is theoretically possible that he could change his mind about having Cerovene make RoxyBond, DiFalco should be disqualified from having any say on the important business issue of what CMO to recommend to Daiichi.[321] This seemingly limitless interpretation of the scope of Section 5.14(b) defies common sense and demonstrates the unworkability of the provision.[322]

In *Vila v. BVWebTies LLC*, Chief Justice Strine, writing as Vice Chancellor, commented that "this court has rejected the notion that one co-equal fiduciary may ignore the entity's governing agreement and declare himself the sole 'decider.'"[323] After finding that the manager of an LLC with a duty to cooperate with a co-equal manager had "unilaterally arrogated to himself decisionmaking authority over" the

---

[321] *See* Post-Trial Tr. 175 (arguing that DiFalco retained a conflict of interest on the selection of a CMO for RoxyBond even after equipment necessary for its production was moved out of the Orangeburg Facility because "the equipment can be put back in").

[322] Lest there be any doubt, the court rejects Aigner's request for a categorical declaration that Section 5.14(b) bars DiFalco from using his Veto Rights on the selection of CMOs or development partners. Apart from the fact that such a declaration would not be warranted based on the facts as of the time of trial, it would be imprudent to grant what amounts to an advisory opinion about hypothetical conflicts of interest that may exist in the future, the resolution of which would necessarily depend on the specific facts and circumstances at the time. *See KLM Royal Dutch Airlines v. Checchi*, 698 A.2d 380, 382 (Del. Ch. 1997) ("Advisory opinions ill-serve the judicial branch and the public by expending resources to decide issues that may never come to pass. More importantly, the judiciary's role in the lawmaking process is an interstitial one, carried out by the application of legislative enactments and common law principles *to concrete factual circumstances that have created real and present controversies*. An action seeking declaratory relief is not exempt from these requirements and must present the court with an actual controversy that is ripe for judicial decision. *The dispute between the parties, therefore, must be actual, not hypothetical.*") (emphasis added).

[323] 2010 WL 3866098, at *8.

company, the court ordered judicial dissolution based on its conclusion that "it is not reasonably practicable for the LLC to operate consistently with its operating agreement."[324] The same conclusion is compelled here.

To summarize, the IDS Agreement is structured to require Aigner and DiFalco to obtain each other's "advice and consent" in fulfilling their duties as CEO and President, respectively, and—now that Shah has resigned as a manager—provides each of them with the presumptive right to veto any Board action. In other words, the operating agreement affords Aigner and DiFalco co-equal rights to manage the Company. As a factual matter, the past two years of their relationship demonstrates that Aigner and DiFalco do not trust each other, do not get along, and are deadlocked on issues critical to the Company. And, for the reasons discussed above, Section 5.14(b) provides no workable solution to these problems. To the contrary, by acting unilaterally to invoke the Independent Representative provision, and by exploiting the inherently ambiguous and vague scope of that provision in the process, Aigner has arrogated to himself virtually unfettered control over the Company's management in contravention of the governance structure contemplated in the IDS Agreement. Given this reality, the court concludes that it is not reasonably

---

[324] *Id.* at *1, *6; *see also Haley*, 864 A.2d at 91, 96, 98 (holding that it was "not reasonably practicable for the LLC to continue to carry on business in conformity with the LLC Agreement" where one co-equal manager had "forbid[]" the other "to enter the premises" of the business and argued "that the LLC can and does continue to function" under his sole management).

practicable to carry on the business of the Company in conformity with the IDS Agreement. The only remaining question is one of remedy, which is addressed next.

### 3. Judicial Dissolution of IDS Is Warranted

Section 10.02(c) of the IDS Agreement provides that IDS "shall be dissolved and its affairs wound up upon . . . the entry of a decree of judicial dissolution . . . under Section 18-802 of the Delaware Act."[325] Although dissolution "is a discretionary remedy" under that statute,[326] this court routinely exercises its discretion to dissolve LLCs when the statutory standard is met.[327] Section 18-803 of the Delaware LLC Act further provides that the court may appoint a liquidating trustee upon dissolution of an LLC for "cause shown."

In a footnote, Aigner argues that, "[i]f the Court enters any relief, it should be similar to the limited relief awarded in *Kleinberg v. Aharon*."[328] In that case, the court declined to order the sale of a deadlocked company and instead appointed a custodian with the power to vote as a tie-breaking director under Section 226 of the

---

[325] JX 44 § 10.02(c).

[326] *Meyer Nat. Foods*, 2015 WL 3746283, at *3.

[327] *See, e.g.*, *GR BURGR*, 2017 WL 3669511, at *1; *Meyer Nat. Foods*, 2015 WL 3746283, at *5-6; *In re Shawe & Elting LLC*, 2015 WL 4874733, at *1 (Del. Ch. Aug. 13, 2015); *Vila*, 2010 WL 3866098, at *1, *14; *Fisk Ventures*, 2009 WL 73957, at *1; *In re Silver Leaf, L.L.C.*, 2005 WL 2045641, at *11 (Del. Ch. Aug. 18, 2005); *Haley*, 864 A.2d at 98.

[328] Pl.'s Opening Br. 60 n.22.

Delaware General Corporation Law.[329] The court declines to follow that course here and finds that cause has been shown to appoint a liquidating trustee under Section 18-803 of the Delaware LLC Act for essentially three reasons.

First, unlike the entity at issue in *Kleinberg*, IDS is a Delaware limited liability company. Limited liability companies have been described as "creatures of contract"[330] in reference to the policy of the Delaware LLC Act "to give the maximum effect to the principle of freedom of contract and to the enforceability of limited liability company agreements."[331] In this case, the IDS Agreement does not contain a buy-sell provision or any other provision prescribing a solution for deadlock where the mechanism in Section 5.14(b) has proven unworkable. And, as a former Chancellor once said, the court "is in no position to redraft the LLC Agreement for these sophisticated and well-represented parties."[332]

Second, the dispute between Aigner and DiFalco (as well as Shah before his resignation) extends back more than two years during which all of their attempts to fix the Company's governance problems have failed. Aigner single-handedly defeated one of those attempts over eighteen months ago when he vetoed a resolution to expand the Board from four to five members without veto rights even though the

[329] 2017 WL 568342, at *1, *15 (Del. Ch. Feb. 13, 2017).

[330] *TravelCenters of Am., LLC v. Brog*, 2008 WL 1746987, at *1 (Del. Ch. Apr. 3, 2008).

[331] 6 *Del. C.* § 18-1101(b).

[332] *Fisk Ventures*, 2009 WL 73957, at *7.

proposal was supported by Leduc,[333] whose independence Aigner has repeatedly touted. The court has no confidence that a reprise of that proposal in the form of a custodian with the power to vote as a tie-breaking manager would work now, particularly given the deep-seated distrust and animosity between the principals that now exists as well as the evidence of Aigner's repeated designs to marginalize DiFalco's managerial role in the Company.

Third, by all accounts, time is of the essence. The FDA approved MorphaBond in November 2015, but only limited quantities of that product have been made since.[334] The FDA approved RoxyBond in April 2017, but that product has never been manufactured on a commercial scale.[335] The Company has not created any new products since its formation, has not entered into a product development agreement, and has no obvious source of financing for the $10 to $15 million necessary to obtain FDA approval for a new drug. As Bodd and DiFalco both testified, the window of opportunity for the Company is rapidly closing because its patents are expiring.[336]

Under these circumstances, the court concludes that dissolution of the Company is the best and only realistic option to force the parties to find a solution

---

[333] JX 162 at 8-9.

[334] Tr. 155 (Bodd); Tr. 549 (Shah); JX 292 at 7.

[335] Tr. 155 (Bodd); Tr. 535 (Innaurato); Tr. 615 (Shah).

[336] Tr. 184 (Bodd); Tr. 764-65 (DiFalco).

where they have failed before, or, if they cannot, to yield value for them by selling the Company's assets. Accordingly, the court will declare the Company to be dissolved and appoint a liquidating trustee to wind up its affairs.

## D. The Issues Concerning BDO

Shortly before trial, Aigner amended his pleading to add two claims that relate to DiFalco's alleged failure to provide documents to BDO concerning the build-out of the Orangeburg Facility: (1) a fifth cause of action for breach of fiduciary duty seeking declaratory and injunctive relief as well as damages; and (2) a sixth cause of action for breach of the IDS Agreement and its transparency policy seeking declaratory relief and damages.[337] These claims exceed the scope of the type of claim that the court intended to permit Aigner to add to his complaint for purposes of the trial at the conclusion of the hearing held on Aigner's motion for injunctive relief on December 6, 2018. To be more specific, the court only had in mind an amendment to add a claim focused on resolving whether DiFalco should be required to provide certain information to BDO. During trial, little attention was paid to that issue, and no testimony was provided from a BDO witness.

Given these circumstances, with one exception, the court will not take any action with respect to the fifth and sixth causes of action in the Complaint, which are

---

[337] Dkt. 108 ¶¶ 139-56.

93

the subject of a motion to dismiss.[338]  The exception is that the liquidating trustee to be appointed in this action will be authorized to address any issues concerning BDO's need, if any, for information concerning the Orangeburg Facility.

## IV.  CONCLUSION

For the reasons explained above, judgment is entered in favor of DiFalco and Shah, as the case may be, and against Aigner with respect to (i) the fourth cause of action in the Complaint, (ii) the first two claims in the Counterclaim, and (iii) the third claim in the Counterclaim insofar as it seeks a declaration that Touam is not currently a validly appointed Independent Representative under Section 5.14 of the IDS Agreement.

The parties are directed to confer to see if they can agree on a liquidating trustee and, if no such agreement can be reached after five business days, each side is directed to file with the court within five business days thereafter the names of two proposed liquidating trustees (with their qualifications) who are willing to accept the assignment.  The parties are further directed to confer and to submit to the court an implementing order consistent with this decision within five business days.

**IT IS SO ORDERED.**

---

[338] Dkt. 118.